[Crim. No. 10167. In Bank. Feb. 19, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DOYLE ALVA TERRY, Defendant and Appellant.

Doyle Alva Terry, in pro. per., and Ernest L. Graves, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—Doyle Alva Terry was found guilty by a jury on one count of first degree murder, five counts of robbery, and one count of conspiracy to commit robbery. He admitted prior convictions of violating Penal Code sections 288 and

286. The jury fixed the penalty at death for the murder. On appeal we affirmed the judgment except the determination of the penalty on the murder count. (*People* v. *Terry,* 57 Cal.2d 538 [21 Cal.Rptr. 185, 370 P.2d 985].) Upon retrial of that issue the jury again returned the death penalty, and we again reversed the judgment imposing the death penalty. (*People* v. *Terry,* 61 Cal.2d 137 [37 Cal.Rptr. 605, 390 P.2d 381].) At the third penalty trial the court declared a mistrial after the jury became hopelessly deadlocked. A fourth penalty trial was held at which defendant represented himself. The jury again fixed the penalty at death. A motion for a new trial was denied, and defendant's third automatic appeal is now before us. (Pen. Code, § 1239, subd. (b).)

Defendant contends, among other things, that it was improper to excuse for cause veniremen who were opposed to capital punishment. We have concluded that under the compulsion of *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], the death penalty must be set aside because at least one venireman was improperly excluded. It is therefore necessary that defendant again be remanded to the trial court for another trial limited to the issue of the penalty for the murder.

On June 24, 1960, defendant fatally shot Police Officer Vernon Owings. Police Officer Richard Brizendine and defendant's companion, Ross Wilson, who were present at the shooting, testified as prosecution witnesses to the circumstances surrounding the killing. The prosecution also introduced additional evidence to support its theory that defendant intentionally shot the officer to prevent being taken into custody for various offenses. Defendant testified in his own behalf and introduced other evidence to support his theory that the shooting was accidental and that he had not committed the other offenses.

*Excluding Veniremen Opposed to Capital Punishment*

Thirty-five prospective jurors were excused for cause on the basis of their attitude toward the death penalty.[1] Under *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, it was error to exclude one or more of them. For example, the court asked if any of the veniremen "have a conscientious objection or opinion as to the imposition of the death penalty in a proper case." Several prospective jurors raised their hands, and one such

---

[1]Four prospective alternate jurors were also excused for cause on the same basis, but no alternate was substituted for any member of the trial jury.

juror apparently was a Mr. McFarland. The following discussion ensued: ''THE COURT: . . . Mr. McFarland, you feel that even though this was a proper case for the imposition of the death penalty that you could not and would not vote for a verdict imposing the death penalty because of your conscientious objection or opinion? JUROR McFARLAND: I am opposed to the death penalty, yes. MR. FITTS [the prosecutor]: I didn't hear that. THE COURT: He said, 'I am opposed to the death penalty'; is that correct, Mr. McFarland? JUROR McFARLAND: Yes, sir.'' The court then excused the venireman for cause.

Venireman McFarland's response ''I am opposed to the death penalty, yes'' manifestly is ambiguous. The response can reasonably be interpreted as stating in effect that if the question was whether he was opposed to the death penalty the answer is yes. It appears from the trial court's subsequent remark heretofore quoted that the court understood the response as merely expressing opposition to the death penalty, but the court did not continue with the *voir dire* to clarify the venireman's attitude and instead excused him for cause.[2]

The record thus shows that venireman McFarland did not make it ''unmistakably clear'' that he ''would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial'' (*Witherspoon* v. *Illinois, supra*, 391 U.S. 510, 523, fn. 22 [20 L.Ed.2d 776, 794]). *Witherspoon* noted (at p. 516, fn. 9 [20 L.Ed.2d at p. 781]) that ''Unless a venireman states *unambiguously* that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.'' (Italics added.) ''[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.'' (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522 [20 L.Ed.2d 776, 784].)

*Whether Fifth Penalty Trial Will Constitute Cruel or Unusual Punishment*

 Defendant also contends that subjecting him to any

[2]The trial court's action is understandable since the trial preceded the decision in *Witherspoon* v. *Illinois, supra,* 391 U.S. 510. *Witherspoon* sets forth new rules that the states are not only compelled to follow but must apply retroactively (391 U.S. at p. 523, fn. 22 [20 L.Ed.2d at p. 794]).

further penalty trials will constitute cruel and unusual punishment in violation of the federal Constitution. A similar contention was rejected in *Purvis* v. *California,* 234 F.Supp. 147, 151. In that case the petitioner sought to prevent the holding of a fourth penalty trial after he had three times obtained reversal of the death penalty because of misconduct of the prosecutor. The court stated in part that "As a general proposition having to sit through a trial may be an onerous burden for a defendant, but it is not a cruel and certainly not an unusual punishment." The court also stated that "Certainly the California authorities should now be on notice that there is a constitutional limit to the number of times a man must undergo a trial where his life is at stake, and where one of the reasons for the repeated trials is deliberate misconduct by the prosecutor." The court, however, did not regard the fourth penalty trial as exceeding that limit. In the instant case, where deliberate misconduct has not been a factor in the reversal of penalty trials, a fifth penalty trial will not constitute such punishment.

*Asserted Error in Failing to Give Certain Instructions*

On defendant's second automatic appeal we held that the court improperly excluded evidence tending to show his possible innocence and erroneously restricted his right to examine prospective jurors on *voir dire* with respect to their possible reaction to his claim of innocence and misled the jury into thinking that they could not take into consideration his claim of innocence as a mitigating factor. (*People* v. *Terry, supra,* 61 Cal.2d 137, 145-147.) ▆ At the fourth penalty trial defendant was allowed to introduce evidence of his innocence of the crimes involved and to ask questions on *voir dire* regarding whether prospective jurors would consider his claim of innocence. He now contends that the court committed prejudicial error in not instructing the jury that any doubt it might have regarding his guilt could properly be considered as a mitigating factor in the penalty determination. He points to jurors' affidavits which he submitted to the trial court in support of his motion for a new trial and from which it appears that, following an argument among themselves, the jurors accepted the view that the verdict of the jury at the guilt trial was binding upon them and precluded consideration of defendant's possible innocence as a mitigating factor. One of the jurors further stated in her affidavit ". . . . had I been instructed by the Court that, under the law, it was proper for me to consider, as a mitigating factor, my belief of

the defendant's innocence, I would not have compromised and voted for the death penalty." A second juror made a similar statement.

Before final arguments defendant orally requested that the court give an instruction "relating to the question of possible innocence of the defendant as bearing on mitigation." The court denied the request, stating that the instructions that would be given were adequate. After the jury began its deliberations the court refused to give a written instruction submitted by defendant regarding doubt of guilt as a mitigating factor.[3]

The instructions given informed the jury in part that "The defendant in this case has been found guilty of the offense of murder in the first degree, and it is now your duty to determine which of the penalties provided by law should be imposed for that offense. In arriving at the determination you should consider all of the evidence received here in court presented by the People and defendant throughout the trial before this jury. You may also consider all of the evidence of the circumstances surrounding the crime, of the defendant's background and history, and of the facts in aggravation or mitigation of the penalty which has been received here in court. However, it is not essential to your decision that you find mitigating circumstances on the one hand or evidence in aggravation of the offense on the other. . . . Beyond prescribing the two alternative penalties, the law itself provides no standard for the guidance of the jury in the selection of the penalty, but, rather, commits the whole matter of determining which of the two penalties shall be fixed to the judgment, conscience and absolute discretion of the jury. . . ."

The trial court was not required to initiate an instruction to the jury on the considerations that should be taken into account when determining the penalty. ■■■ As we stated in *People* v. *Polk,* 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641] : "We do not agree that such an instruction is compulsory. The Legislature has entrusted to the absolute discretion of the jury the awesome decision between life imprisonment and the death penalty in first degree murder cases. (Pen.

---

[3]The instruction read, "You are instructed that although the defendant has been found guilty of first degree murder and you will not decide that question, evidence bearing upon the defendant's innocence of that charge is admissible in this proceeding and may be considered by you in your determination of punishment; so that any such evidence which raises or creates a doubt of the guilt of the defendant may be weighed and considered by you as possible mitigation in your determination of punishment."

Code, § 190; *People* v. *Green,* 47 Cal.2d 209, 218 [302 P.2d 307].) The Legislature has thus indicated its belief that jurors understand the factors that are relevant to such a decision. Recitation of such factors by the trial court is therefore not essential." Nor was the court required to give the instructions requested by defendant, even had his request been in writing and timely.[4] We noted in *People* v. *Polk, supra,* 63 Cal.2d 443, 451, that "The trial court may . . . properly aid the jury by stating the kinds of factors that may be considered, thereby setting the tone for the jury's deliberation. (See *People* v. *Friend,* 47 Cal.2d 749, 767-768 [306 P.2d 463]; Model Pen. Code, § 210.6 (Proposed Official Draft 1962).)" However, "Penal Code section 190.1, which provides for the bifurcated trial, also provides that on the penalty trial evidence may be presented 'of any facts in aggravation or mitigation of the penalty.' This does not mean that the court should emphasize a single piece of evidence, favorable to one side or the other, for the jury's deliberation. It is sufficient that the court clearly advises the jury that they may consider any fact in evidence in determining the penalty. . . ." (*People* v. *Clark,* 62 Cal.2d 870, 887 [44 Cal.Rptr. 784, 402 P.2d 856].)

Before final arguments to the jury, the court refused defendant's oral request that the jury be instructed as to second degree murder and manslaughter. The instructions given defined first degree murder only. After the jury began its deliberations defendant submitted written instructions regarding second degree murder and manslaughter, and the court refused to give them. Defendant contends that had the same jurors been present at both the guilt phase and the penalty phase of the trial, they would have received the benefit during the latter of the instructions given at the former. He alleges that jurors not present at the guilt trial could not meaningfully consider his claim of innocence as a mitigating factor in the penalty trial without such instructions to provide a frame of reference within which to weigh the evidence of his innocence. However, for the reasons set forth above in *People* v. *Clark, supra,* 62 Cal.2d 870, 887, it was not obligatory for the trial court to give the instructions in question.[5]

---

[4] An instruction which a party desires must be prepared in writing and delivered to the court before commencement of argument. (Pen. Code, §§ 1127, 1093.5; see Witkin, Cal. Criminal Procedure (1963) Trial, § 473, pp. 479-480.)

[5] We reach the same conclusion with respect to defendant's assertion that the court erroneously failed to instruct the jury on its own motion regarding the *Wells-Gorshen* rule of diminished capacity.

*Asserted Error in Admission of Evidence*

■ Ross Wilson was permitted to testify, over objection, that during a conversation with defendant while they were confined in jail after having been charged with the murder, defendant freely and voluntarily made certain incriminating statements concerning the killing of Officer Owings.[6] Although Wilson admitted that he pointed out defendant's residences to the police before the conversation and that he ultimately testified for the prosecution at defendant's trials, he maintained that at the time of the conversation he was not ''in any way working with or for police officers in an attempt to secure evidence from Mr. Terry.'' Since defendant's statements were not elicited by the police and the evidence supports the trial court's implied finding that Wilson was not acting as a government agent at the time, Wilson's testimony was not inadmissible under *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and *Massiah* v. *United States,* 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. (*People* v. *Teale,* 63 Cal.2d 178, 184-185, 196 [45 Cal.Rptr. 729, 404 P.2d 209 [revd. on other grounds in 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]]; cf. *People* v. *Boulad,* 235 Cal.App.2d 118, 124 et seq. [45 Cal.Rptr. 104]. [cert. den. 383 U.S. 915 [15 L.Ed.2d 669, 86 S.Ct. 905]].) Nor will Wilson's testimony be inadmissible under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], at defendant's fifth penalty trial if the evidence and finding are the same.[7]

■ To support its theory that the murder was committed intentionally to avoid arrest, the prosecution introduced, among other things, evidence regarding a robbery of a branch office of the Bank of America on March 13, 1959. A bank teller testified that defendant robbed him, and Ross Wilson testified as to conversations with defendant pertaining to the robbery

---

[6]Wilson was charged not only with the murder but also with the count charging conspiracy to commit robbery and the five robbery counts. Just before the conclusion of the prosecution's case at the guilt trial, Wilson withdrew his not guilty pleas to the conspiracy count and one count of robbery, the remaining counts against him were dismissed, and he was placed on probation.

[7]Defendant's fourth penalty trial preceded *Miranda* v. *Arizona, supra,* 384 U.S. 436, and was therefore not governed by that decision (*People* v. *Rollins,* 65 Cal.2d 681, 691 [56 Cal.Rptr. 293, 423 P.2d 221]), but under the majority opinion in *People* v. *Doherty,* 67 Cal.2d 9 [59 Cal.Rptr. 857, 429 P.2d 177], *Miranda* will be applicable at defendant's fifth penalty trial.

and observations of the loot.[8] Defendant unsuccessfully objected to the evidence on several grounds now asserted here.

Defendant points out that he was never formally charged with or convicted of the offense. However, there is no requirement that a defendant must have been charged or convicted in order to introduce at a penalty trial relevant evidence of other prior criminal conduct. (*People* v. *Griffin,* 66 Cal.2d 459, 464 [58 Cal.Rptr. 107, 426 P.2d 507]; *People* v. *Tahl,* 65 Cal.2d 719, 734 [56 Cal.Rptr. 318, 423 P.2d 246]; *People* v. *Mitchell,* 63 Cal.2d 805, 815-816 [48 Cal.Rptr. 371, 409 P.2d 211]; *People* v. *Jones,* 52 Cal.2d 636, 647-648 [343 P.2d 577].)

Defendant further asserts that the statute of limitations had run as to the robbery. (Pen. Code, § 800.)[9] He suggests that section 800 embodies a policy judgment by the Legislature that penal sanctions should not be imposed as a result of a finding of guilt of robbery for which prosecution was not commenced within three years after its commission. He points out that as a result of the lapse of time it may be difficult for defendants to prove the facts or make a fair presentation of the case (see *Developments in the Law: Statutes of Limitations,* 63 Harv.L.Rev. 1177, 1185, 1186), and he argues that "[T]he jury may conceivably rest the death penalty upon any piece of introduced data. . . ." (*People* v. *Hines,* 61 Cal.2d 164, 169 [37 Cal.Rptr. 622, 390 P.2d 398]) and that the introduction of evidence of the robbery would allow the jury to violate indirectly a policy that cannot be directly violated.

The language of section 800, however, does not prohibit the introduction of evidence of prior criminal acts for which prosecution would be barred by the statute of limitations. Such evidence is not introduced in order to impose a penalty for those prior acts, but rather as evidence "of the circumstances surrounding the crime [of murder], of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty [for murder]" as authorized by Penal Code section 190.1. The fact that the prosecution for the robbery may have been barred by the statute of limitations is immaterial here.

In an analogous case, where the prosecution intended to·

---

[8]The jury was instructed that before they may consider the robbery they must be convinced beyond a reasonable doubt that defendant committed it. (*People* v. *Polk, supra,* 63 Cal.2d 443, 451.)

[9]Penal Code section 800 reads: "An indictment for any other felony than murder [and other enumerated felonies not including robbery] must be found, and information filed, or case certified to the superior court, within three years after its commission."

establish at the guilt trial that the murder was of the first degree because committed during an attempt to perpetrate robbery, the defendant claimed that, since the statute of limitations had run on the attempted robbery, the court erred in allowing the prosecution to question veniremen on *voir dire* as to whether they would follow an instruction regarding the felony-murder rule. We rejected the claim, stating that it was immaterial at the murder trial that a prosecution for the attempted robbery might be barred. (*People* v. *Risenhoover, ante,* p. 39 [73 Cal.Rptr. 533, 447 P.2d 925].)

Moreover, in the instant case evidence with respect to the robbery was introduced at defendant's first trial which was within three years of the robbery, and at his most recent penalty trial he was in no worse position than any defendant properly charged with a crime within the period set by the statute of limitations, but not brought to trial until some later time because of a series of successful appeals. (Cf. *In re McCartney,* 64 Cal.2d 830, 832 [51 Cal.Rptr. 894, 415 P.2d 782].)

Defendant contends that the bank teller's identification testimony was inadmissible because he had first identified defendant at a lineup, conducted after defendant was charged with murder and while he was deprived of the assistance of counsel. However, the rules announced in *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]—requiring the exclusion of identification evidence which is tainted by exhibiting the accused to identifying witnesses before trial in the absence of counsel—affect only those cases involving showups conducted after June 12, 1967. (*Stovall* v. *Denno,* 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]; *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21]. The lineup here was long before that date.

A further question is whether the lineup was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process." (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206]; see also *People* v. *Feggans, supra,* 67 Cal.2d 444, 448-449.) The only evidence regarding the lineup was the bank teller's testimony that when he described the robber to the police on the day of the robbery he stated that the robber was in his early thirties. The persons in the lineup, other than defendant and Wilson, were in their teens or early twenties. This alone is not sufficient to show a denial of due process.

Defendant attacks as products of an illegal search the introduction of the murder weapon, a bullet taken from the gun, and a picture comparing the bullet with the bullet recovered from Officer Owings' body. Officer Cloud, who recovered the weapon from a car, testified that he received over the police radio a broadcast with respect to the slaying, that the killer's car was described in the broadcast, that the officer was dispatched to the area to search for the vehicle and its occupant, and that the officer was warned that the killer was believed to be armed and should be considered dangerous. Approximately 20 minutes later he found the automobile parked on a street and could see that no one was in the auto. He had no warrant and did not check in by radio to determine if the suspect had been captured. He opened a door of the car and observed the revolver lying on the floor. Approximately five minutes later he observed defendant in the custody of a fellow officer; to his knowledge defendant had not been arrested in or about the automobile. Defendant's contention that under the circumstances Officer Cloud should have obtained a warrant before searching the automobile cannot be sustained. "The law recognizes that fresh pursuit of a fleeing suspect who has committed a grave offense and remains dangerous to life and limb may constitute 'exceptional circumstances' sufficient to justify a search without a warrant." (*People* v. *Smith*, 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222] [cert.den. 388 U.S. 913 [18 L.Ed.2d 1353, 87 S.Ct. 2119]; rehg. den. 389 U.S. 893 [19 L.Ed.2d 211, 88 S.Ct. 13]].) A search of the car, abandoned by an individual suspected of killing a police officer within the last 20 minutes and presumably armed and in flight, would help ascertain whether its former occupant was armed and where he might be located. The pressing urgency of such determinations amply justified the search. Since the search of the car was legal, the fruits of that search were properly admitted.

Over defendant's objections, the prosecution introduced extensive evidence with respect to an incident that occurred at his Garfield Place apartment some five months before the homicide.

Two police officers testified that they were on duty in Hollywood when they responded to a call to investigate a complaint by two youths, aged 17 and 18. The youths told them that they had met defendant outside the U.S.O. in Hollywood and that he had invited them to his apartment. Accepting the invitation, the boys had accompanied defendant

to his car, where they had seen a marijuana cigarette in a clip on the dashboard. At the apartment, defendant had offered them some marijuana and performed an indecent act as to one of the boys. They became frightened and fled the apartment.

The officers further testified that they returned to the apartment house around midnight with the two boys and two plainclothes officers. Upon arrival, the police officers and one of the boys went to the subterranean garage, where the boy pointed out defendant's automobile. Through the window of the locked car the police officers observed an object lying across the top of an open ashtray that appeared to be a partially smoked marijuana cigarette.

Meanwhile, the two plainclothes officers and the other boy went to the door of the apartment. The plainclothes officers placed themselves out of sight and the boy knocked on the door. When the door was opened, the officers came out of hiding and entered the apartment. The plainclothes officers had no warrant. They did not identify themselves or their purpose before entering.[10] They neither asked for nor received permission to enter. They ignored defendant's protests and demands that they leave, and proceeded to make a cursory visual search of the apartment, including the bedroom and the clothes closet, for narcotics or weapons. They discovered neither, but did note the presence of Ross Wilson in the bedroom. Defendant phoned his attorney, but the officers refused to speak to the attorney.

As prearranged, the plainclothes officers summoned the police officers from the garage after the former entered the apartment, and then left the premises. When the police officers entered the apartment, defendant was still on the telephone and Ross Wilson was in the bedroom. One police officer returned to the garage to look at the car and attempt to unlock it. The other police officer was in the apartment for five or ten minutes when defendant took the phone into the bedroom and closed the door. When he entered the bedroom a minute or a minute and a half later, he found the window open and no one present. He notified his companions and a fruitless search was conducted.

Approximately thirty minutes later a plainclothes officer reentered the apartment with the manager and made a further visual search without a warrant. A day or two later the manager again accompanied police into the apartment; she

---

[10]One officer testified that ''I showed [defendant] my identification when I first moved in.''

did not recall if they produced a warrant. The police impounded the automobile and its contents; analysis of the cigarette indicated that it contained marijuana. The manager testified that she later repossessed the apartment, but that defendant never returned to reclaim his personal possessions. As a result of a police investigation of the incident, a complaint was filed charging defendant with molesting minors (Pen. Code, § 647a, subd. (1)), furnishing narcotics to a minor (Health & Saf. Code, § 11532), and possession of marijuana (Health & Saf. Code, § 11530). Defendant's picture and the warrant were publicized on local television stations. At the time of the killing, the warrant for defendant's arrest was still outstanding.

All the above evidence was introduced for the purpose of establishing that defendant's state of mind at the time of the homicide was one of flight from the police. The jury was instructed that the evidence was admitted only for that limited purpose and not as evidence of criminal conduct on the part of defendant. Motions to suppress the evidence, made before trial and during trial before the introduction of evidence, were denied; various objections during the introduction of the evidence were likewise overruled.

Defendant first contends that the entry into the garage was an illegal trespass, and that the search of the car and seizure of the marijuana cigarette were illegal. We held in our review of his second penalty trial that "Apparently the apartment garage was a common area; the officers did not commit a trespass by entering it. Nor did the officers conduct an unreasonable search by looking in the window of the car. (*People* v. *Martin* (1955) 45 Cal.2d 755, 762 [290 P.2d 855].)" (*People* v. *Terry, supra,* 61 Cal.2d 137, 152.)

In an effort to avoid our prior holding defendant on cross-examination of the apartment house manager at the present trial elicited testimony that the garage "was not a common area open to the public" but "rather a private area not open to the public," that "[i]n other words, the . . . garage . . . was not an enclosed piece of land that had been set aside for public or municipal use," and that there were no spaces in the garage for parking by guests. The manager also testified that the garage was a "common parking area for tenants of the apartment building." One of the officers who entered the garage testified that there was no indication that the garage was a common area or public parking. His partner stated that the garage was big—that it would definitely hold 5 cars but

that he could not recall whether it would accommodate 105 cars.

Even if it were assumed in the light of this additional evidence that the officers' entry into the garage was a technical trespass, their observations therein, as we shall see, did not constitute an unreasonable search.

The Fourth Amendment of the United States Constitution provides, ''The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'' This amendment, made applicable to the states by the Fourteenth Amendment (*Mapp* v. *Ohio,* 367 U.S. 643, 655-657 [66 L.Ed.2d 1081, 1089-1091, 81 S.Ct. 1684]) ''protects individual privacy against certain kinds of governmental intrusion,'' although ''its protections go further, and often have nothing to do with privacy at all.'' (*Katz* v. *United States,* 389 U.S. 347, 350 [19 L.Ed.2d 576, 581, 88 S.Ct. 507].)[11] The prohibition in the amendment is against unreasonable searches and seizures, not trespasses.

Police officers in the performance of their duties may, without violating the Constitution, peaceably enter upon the common hallway of an apartment building without a warrant or express permission to do so. (*United States* v. *St. Clair,* 240 F.Supp. 338, 340; *United States* v. *Buchner,* 164 F.Supp. 836 [affd. per curiam 268 F.2d 891; cert. den. 359 U.S. 908 (3 L.Ed.2d 573, 79 S.Ct. 584)]; *People* v. *Seals,* 263 Cal.App. 2d 575, 576 et seq. [69 Cal.Rptr. 861]; cf. *United States* v. *Miguel,* 340 F.2d 812 [cert. den. 382 U.S. 859 (15 L.Ed.2d 97, 86 S.Ct. 116)]; *United States* v. *Lewis,* 227 F.Supp. 433. 436-437.) Even if such an entry constitutes a trespass, a simple trespass without more does not invalidate a subsequent search and seizure. (*United States* v. *Buchner, supra,* 164 F.Supp. 836, 839; *People* v. *Seals,* 263 Cal.App.2d 575, 576 et seq.; see *Teasley* v. *United States,* 292 F.2d 460, 464; see also *People* v. *Willard,* 238 Cal.App.2d 292, 298 et seq. [47 Cal. Rptr. 734]; and *Giacona* v. *United States,* 257 F.2d 450, 456, [cert. den. 358 U.S. 873 (3 L.Ed.2d 104, 79 S.Ct. 113)],

---

[11]With respect to the latter phrase the Supreme Court stated in *Katz* (at p. 350, fn. 4 [19 L.Ed.2d at p. 581]) '' 'The average man would very likely not have his feelings soothed any more by having his property seized openly than by having it seized privately and by stealth. . . . And a person can be just as much, if not more, irritated, annoyed and injured by an unceremonious public arrest by a policeman as he is by a seizure in the privacy of his office or home.' *Griswold* v. *Connecticut,* 381 U.S. 479, 509 [14 L.Ed.2d 510, 530, 85 S.Ct. 1678] (dissenting opinion of Mr. Justice Black).''

[minor trespass, not involving entry of building, does not render observations an unreasonable search].

In the instant case the garage, used in common by the tenants of the apartment building, is similar in nature to a common hallway of an apartment building. The officers apparently entered the garage without force. As we have seen, defendant's car was parked in the garage and the marijuana was in plain sight on an open ashtray inside the car. Any expectation by defendant of privacy as to objects in plain sight in the car would have been unreasonable, and no constitutionally protected right of privacy was violated when the officers looked through the window of the car.

In our review of defendant's second penalty trial we further held that "If a police officer has probable cause to believe that an automobile contains contraband he need not obtain a search warrant in order to search it. (*People* v. *Gale* (1956) 46 Cal.2d 253, 255 [294 P.2d 14]; *People* v. *Brajevich* (1959) 174 Cal.App.2d 438, 444 [344 P.2d 815].) In this case the officers had heard the youths' story, had corroborated it by observing through the locked window of the automobile an object that appeared to be a marijuana cigarette, and had witnessed defendant's flight under suspicious circumstances. These facts adequately establish probable cause for suspecting that the automobile contained marijuana." (*People* v. *Terry, supra*, 61 Cal.2d 137, 152.) Probable cause to search the automobile existed even before the police officers were summoned from the garage to the apartment and defendant fled. Therefore the fact that the initial entry into the apartment by the plainclothes officers might have been illegal would not transform the marijuana cigarette into the fruit of an illegal search. (Cf. *People* v. *Ditson*, 57 Cal.2d 415, 443-445 [20 Cal.Rptr. 165, 369 P.2d 714].)

Defendant contends that the plainclothes officers' initial entry into the apartment was illegal, and that evidence of the searches of the apartment, his flight therefrom, his failure to return, and the issuance of the warrant and subsequent publicity was inadmissible as the fruit of that illegal entry. However, even assuming that the plainclothes officers did not have probable cause to arrest defendant based upon the untested story of the two unfamiliar youths; and therefore could not legally search his apartment without a warrant, the police officers who entered from the garage did have independent probable cause to make an arrest. The latter had not only heard the boys' complaint but had made the corroborating observation of a marijuana cigarette in defendant's

automobile. When probable cause to arrest exists at the outset, a search preceding the formality of a substantially contemporaneous arrest may be incident thereto (*People* v. *Cockrell*, 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116] [cert.den. 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]]); the fact that defendant's flight prevented an arrest does not alter the legality of the police officers' entry and search. In addition, an examination of the record indicates that the initial search by the plainclothes officers did not turn up narcotics, weapons, or other incriminating evidence; their testimony at the trial could not have prejudiced defendant's case.

 Furthermore, even assuming that the plainclothes officers did not comply with the announcement requirements of Penal Code section 844 before entering the apartment,[12] and that this illegality affected the legality of the subsequent method of entry of the police officers from the garage, evidence of the defendant's flight from the apartment was not obtained ''by exploitation of that illegality. . . .'' (*Wong Sun* v. *United States*, 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].) Defendant fled through a bedroom window five or ten minutes after the police officers exercised their legal right to enter, as discussed above, by employing an allegedly illegal method of entry. Prior to their entry he had conversed with the plainclothes officers regarding their right to be present and had called and consulted with his lawyer. After their entry he continued to talk to his lawyer, and was allowed to walk into the bedroom and shut the door. Under the circumstances, any connection between the evidence of defendant's flight and the allegedly illegal *method* of entry has ''become so attenuated as to dissipate the taint.'' (*People* v. *Bilderbach*, 62 Cal.2d 757, 766 [44 Cal.Rptr. 313, 401 P.2d 921]. Cf. *Wong Sun* v. *United States, supra,* 371 U.S. 471, 487-488 [9 L.Ed.2d 441, 455-456]; *Badillo* v. *Superior Court,* 46 Cal.2d 269, 273 [294 P.2d 23]; *Gascon* v. *Superior Court,* 169 Cal.App.2d 356, 358 [337 P.2d 201].)

 Evidence of the issuance of the warrant and the subsequent television publicity was properly admitted. The warrant was based on lawfully acquired evidence of the youths' complaint and recovery of the marijuana cigarette

---

[12]Penal Code section 844 reads: ''To make an arrest . . . in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired.''

from defendant's automobile. There is no indication in the record that it was based on defendant's flight, evidence discovered in later searches of the apartment, or the later investigation of the incident by police authorities.[13]

Defendant contends that evidence of his departure from the apartment should have been excluded because he was not advised of his rights in accordance with *Escobedo v. Illinois, supra,* 378 U.S. 478; *Miranda v. Arizona, supra,* 384 U.S. 436; and *People v. Dorado, supra,* 62 Cal.2d 338. However, "The right to counsel during police interrogation established in *Escobedo v. Illinois, supra,* is designed to prevent the use of coercive practices to extort confessions or other incriminating statements. (*In re Lopez,* 62 Cal.2d 368, 372-373 [42 Cal.Rptr. 188, 398 P.2d 380].) It does not protect a defendant from revealing evidence against himself in other ways. It applies only when 'the police carry out a process of interrogations that lends itself to eliciting incriminating statements, . . .' (*Escobedo v. Illinois,* 378 U.S. 478, 491 [12 L.Ed.2d 977, 986, 84 S.Ct. 1758].)" (*People v. Graves,* 64 Cal.2d 208, 210-211 [49 Cal.Rptr. 386, 411 P.2d 114] [cert. den. 385 U.S. 883 [17 L.Ed.2d 111, 87 S.Ct. 175]].)

*Miranda* likewise was designed to afford protection against coercion during in-custody interrogation. The police did not question or coerce defendant, and the danger against which the *Escobedo-Dorado-Miranda* rules were meant to guard was not present.

Defendant contends that for the purpose of establishing that his state of mind at the time of the killing was one of flight from the police, only his knowledge of the outstanding warrant charging him with felonies was admissible. He argues that the facts leading to the issuance of the warrant were not relevant or material to his state of mind, and that those facts were used to imply consciousness of guilt of the offenses charged in the warrant as a matter in aggravation of the killing of which he stood convicted. However, evidence of defendant's flight from the Garfield Place apartment was relevant to the proposition that his state of mind at the time of the killing was one of avoidance of the police, and it could not be meaningfully presented without some explanation of the

---

[13]The record does not indicate that any evidence was produced as a result of later searches of the apartment by the police, and the legality of those searches need not be considered here. The landlady repossessed the apartment and testified as to the possessions she found as well as defendant's failure to return to claim them, but the relationship of her testimony to any alleged illegality in the method of entry is entirely too attenuated to justify exclusion.

presence of police in the apartment. Under the circumstances, it would have been far more prejudicial merely to introduce evidence of the offenses charged in the warrant without explaining that they were based solely on the story of two youths and the discovery of a single marijuana cigarette.

*Other Contentions*

Defendant incorporates the arguments made in *In re Anderson,* 69 Cal.2d 613, 621 et seq. [73 Cal.Rptr. 21, 447 P.2d 117]. For our disposition of those arguments see the *Anderson* opinion, page 621 et seq.

Other contentions by defendant are devoid of merit or pertain to matters that may not arise upon retrial.

Under the compulsion of *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, the death penalty is reversed and the cause is remanded for retrial on the issue of penalty for the murder.

Traynor, C. J., Peters, J., Tobriner, J., and Sullivan, J., concurred.

McCOMB, J.—I would affirm the judgment in its entirety.

Article VI, section 13, of the California Constitution reads: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

The foregoing section I believe to be applicable to the facts of the present case.

Appellant's petition for a rehearing was denied May 8, 1969, and the opinion was modified to read as printed above. Mosk, J., did not participate therein. McComb, J., and Peters, J., were of the opinion that the petition should be granted.