[Crim. No. 30562. Second Dist., Div. Five. May 25, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY SATCHELL, Defendant and Appellant.

## COUNSEL

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Charles M. Sevilla, Chief Assistant State Public Defender, and Martin Stein, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Shunji Asari and John A. Saurenman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—A four-count information charged defendant and codefendant Monroe with robbery (count 1) grand theft auto (count 2) unlawful taking or driving of a vehicle (count 3) and grand theft, person (count 4). After defendant's motion to suppress certain evidence was denied, he withdrew his plea of not guilty to count 4, was rearraigned and pleaded guilty. The other three counts were dismissed in the interest of justice.

The sole issue on appeal is the court's ruling on defendant's motion to suppress.

### FACTS

At about 11:20 p.m., on September 16, 1976, Sergeant Watters and Officer Long were southbound in a marked police vehicle on Sepulveda Boulevard, south of Wilshire. Long was the driver. Watters saw a 1956

Chevrolet southbound. Its left taillight was broken. The officers accelerated to catch the Chevrolet, activated the red lights and honked the horn. The Chevrolet finally stopped just north of Ohio Avenue. Three black men were in the car. Just before the officers stopped the Chevrolet, a report of a purse-snatch robbery came over the radio. It contained a vague general description of the suspects as being "two male Negroes." The scene of the robbery was near the area of Sunset and the San Diego Freeway, only two or three miles to the north.

Officer Long approached codefendant Monroe, the driver. Monroe said he had no identification. Asked about the ownership of the car, he said it belonged to somebody named "Little Bit." He did not know Little Bit's first name and had trouble pronouncing his last name, Sandoval.

Before or during this conversation, Monroe had already been asked to step out of the car. The officers then asked defendant—the right front seat passenger—and the second passenger who was seated in the rear, to step out of the car. The purpose of this request was to conduct a pat-down search for weapons. Articulated reasons were the lateness of the hour, the fact that there were three persons, that this particular area of Sepulveda was very dark with few street lights, that there had been problems with grand theft auto and theft from motor vehicles in the area, the fact that Monroe had no identification and apparently did not know who the car belonged to and that "quite often policemen are attacked by suspects."

After defendant and the other passenger left the car, Watters saw a portion of a purse protruding from underneath the right front seat. Before questioning anyone about the purse, he completed the pat-down for weapons. While patting down defendant, he felt an object "like a wallet or something similar."

Sergeant Watters then asked defendant about the purse. He said that it belonged to his sister who had been in the car earlier in the evening with himself and the other "defendants"—meaning, presumably, Monroe and the second passenger. Monroe, however, said that he did not know anything about the purse and that there had been no female in the car that evening. Watters then decided on a more thorough search to determine whether defendant and Monroe were involved in the purse-snatch incident reported over the radio. He then removed the item he had earlier felt in defendant's pocket. It was a brown coin purse, which contained money, stamps and theatre ticket stubs.[1]

---

[1]The victim of the purse-snatch robbery later identified all seized items as hers.

After receiving certain further particulars concerning the purse-snatching over the radio, Watters placed defendant and Monroe under arrest.

On appeal defendant raises two issues. First: that the trial court erred in considering Sergeant Watters' preliminary hearing testimony at the motion to suppress, defendant not having stipulated thereto. Second: that the seizures of the purse, and of the coin purse and its contents were illegal.

Before the trial court heard the motion to suppress, both defendants made motions to dismiss under section 995 of the Penal Code. These were, of course, necessarily heard on the transcript of the preliminary hearing. In view of the fact that the stolen goods had been found in the defendant's possession, the legal issues argued related solely to the legality of the police procedures leading to the discovery. After the trial court had denied the motions to dismiss it asked: "Is it submitted on the 1538.5 also?" Both counsel answered in the negative and announced that they intended to have a de novo hearing. Sergeant Watters was then sworn as a witness. The court then inquired whether the parties wished to submit the motion on his testimony at the preliminary hearing and any additional evidence which may be given. The People then offered a stipulation to that effect. Monroe's counsel announced: "Yes, that's satisfactory." Defendant's counsel said: "Your Honor, frankly, I would have preferred that the officer testify anew." The court pointed out that his testimony was transcribed and that it had already read it.[2] Defendant's counsel said: "I realize its been transcribed." The court then told him to proceed and cross-examine the officer. Counsel's response was: "May I have a moment, your Honor?" Watters was then cross-examined first by Monroe's attorney, then by defendant's.

After the officer had testified, the prosecutor said that he was not certain whether counsel had ever stipulated "that it may be on the transcript, plus—" The court interrupted, pointing out that Monroe's attorney's written motion to suppress was based, in part, on the preliminary transcript. Satchell's counsel correctly pointed out that his was not. He continued, "But, your Honor, for the record . . . ." The court again interrupted: "I'm talking about [Monroe's counsel]. All right." At that point defense counsel apparently abandoned any effort to explain the precise state of the record to the court and pointed out that the officer's testimony at the preliminary hearing had been "a little different" from

---

[2]As it was bound to have done in order to rule on the section 995 motion.

what it had been at the hearing that had just been concluded. At no point, however, did he make it clear that in his view the preliminary hearing testimony had been used over objection or that there definitely had been no stipulation concerning its use. Rather he used the discrepancies between the officer's previous testimony and the evidence just given to his advantage.[3]

On appeal, defendant wisely does not claim that the trial court's use of the officer's preliminary hearing testimony violated his Sixth Amendment right to confrontation. (*California* v. *Green* (1970) 399 U.S. 149, 165-168 [26 L.Ed.2d 489, 501-503, 90 S.Ct. 1930].) Rather, he correctly points out that section 1538.5, subdivision (i) of the Penal Code entitled him to "litigate the validity of a search or seizure de novo on the basis of the evidence presented at a special hearing." There can be no question that ordinary rules of evidence apply at such special hearing and, absent a stipulation, no exception to the Evidence Code permitted the court to use the officer's preliminary hearing testimony. (*Hewitt* v. *Superior Court* (1970) 5 Cal.App.3d 923, 927-928 [85 Cal.Rptr. 493].)

The real question is whether defense counsel properly objected to the use of the officer's testimony from the preliminary hearing. All that the record shows is his statement that he "*would have preferred* that the officer testify anew." While this statement leaves something to be desired as a stipulation to the use of the preliminary hearing transcript, it certainly was not a clear objection. If we had to give it a label it was a sort of "grumbling acquiescence" in the procedure suggested by the court.

Further we point out that the danger of actual prejudice is practically nonexistent. To the extent that the officer contradicted his preliminary hearing testimony, defendant had the full benefit of the inconsistency

---

[3]Very briefly, the officer's testimony at the section 1538.5 hearing revealed that his testimony concerning Monroe's response to Officer Long's question about the ownership of the car and Long's request to produce identification may have been partly based on hearsay: "Q. And you have indicated that you could hear what he said, but not what the responses were to him? A. I think I could hear part of what was being said, but certainly not enough to repeat. Q. Okay. So your testimony at the preliminary hearing regarding what the responses were was based not on what you heard, but on what your partner told you later, or what you read in the report; is that correct? A. Well, what my partner told me later, and also what was subsequently asked, after he had gotten out of the car. Q. But at the scene, you were hearing the questions, and portions, if any, parts of the answers? A. That's correct."

While these slight discrepancies do not affect the validity of the police procedures at the scene, it does appear that when defense counsel had a clear opportunity to explain that the preliminary hearing transcript had been considered over objection, he failed to do so and used it to his benefit.

both on the merits and for impeachment. To the extent that his testimony paralleled that given earlier, it was, at worst, cumulative. In fact the only technical omission counsel for defendant can point out on appeal is that the cross-examination of the officer at the section 1538.5 hearing did not encompass any of the events that took place after the lady's purse was seen under the seat. It was, of course, counsel's own choice not to delve into that aspect of Watters' evidence.

■ The validity of the seizures presents a closer question. What it boils down to is whether, under all of the circumstances, the officers had a right to order defendant out of the car for the purpose of a pat-down. There can be no question that if the purse was legally observed, the officers were entitled to question Monroe and defendant about it and, that after they received conflicting explanations, they had—in view of the report concerning a purse-snatching—ample probable cause to arrest them. That the actual arrest followed, rather than preceded the discovery of the coin purse, is immaterial. (*People* v. *Terry* (1969) 70 Cal.2d 410, 429 [77 Cal.Rptr. 460, 454 P.2d 36].)

To justify the police conduct, the People gingerly refer to *Pennsylvania* v. *Mimms,* 434 U.S. 106 [54 L.Ed.2d 331, 98 S.Ct. 330] decided December 5, 1977, but, wisely perhaps, do not rely on it. First, *Mimms* merely decided "that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver *to get out of the vehicle* without violating the Fourth Amendment proscription of unreasonable searches and seizures." It certainly did not decide that a routine traffic stop authorizes a pat-down of the occupants of the vehicle. Here, although it was defendant's alighting from the car which exposed the purse, the purpose of the order to get out of the car was a pat-down.[4] Second, at this point we simply do not know whether *Mimms* will be held to accord with "article I, section 13, of the California Constitution, which requires a more exacting standard for cases arising within this state." (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 545 [119 Cal.Rptr. 315, 531 P.2d 1099].)

Nevertheless, looking at the totality of the situation, we have no doubt that the limited intrusion of a pat-down met the standards of *Terry* v. *Ohio* (1968) 392 U.S. 1, 27-30 [20 L.Ed.2d 889, 909-911, 88 S.Ct. 1868],

[4]We appreciate that compliance with a simple order to get out of the car would have exposed the purse just as readily, as defendant's exit for the purpose of being patted down. The People apparently appreciate the problem of justifying what happened on the basis of a fictitious intent.

and of the many California cases that have applied it. (E.g., *People* v. *Hill* (1974) 12 Cal.3d 731, 744-745 [117 Cal.Rptr. 393, 528 P.2d 1]; *People* v. *Vermouth* (1971) 20 Cal.App.3d 746, 753 [98 Cal.Rptr. 65].) In reaching this conclusion we attach no undue importance to certain fringe facts, such as Monroe's inability to produce a driver's license and his vagueness concerning the ownership of the car (cf., *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 194-196 [101 Cal.Rptr. 837, 496 P.2d 1205]); nor do we place more weight on the radio report of the purse snatching incident than the officers themselves did when the confrontation started; nor does the fact that there had been problems with theft in the area where the car had been stopped, amount to much: theft, as such, is not a crime of violence and Sepulveda Boulevard is, after all, a main artery rather than a back alley. Granted all this, there was something fishy in the situation and the officers were certainly entitled to contemplate the possibility of violence. The area was dark and preparatory movements by defendant and his two companions might easily go unnoticed. One of the officers would soon be preoccupied with paperwork, which left only one officer to guard against possible violence from three separate sources. Of course, there were other ways of protecting against a surprise attack: for example, the occupants of the car could have been asked to stand in the headlights of one of the two vehicles and covered by the gun of one of the officers while the other wrote out a ticket. Granting that much, however, in terms of the interests which the Fourth Amendment protects, we can find little difference between a prolonged, acutely embarrassing tableau of that kind and a quick, cursory pat-down. (Cf., *Chambers* v. *Maroney* (1970) 399 U.S. 42, 52 [26 L.Ed.2d 419, 428-429, 90 S.Ct. 1975].)

Affirmed.

Stephens, J., and Hastings, J., concurred.