[Sac. No. 7859. In Bank. Dec. 31, 1970.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF YOLO COUNTY, Respondent;
MARTELL DEAN KIEFER et al., Real Parties in Interest.

Counsel

Thomas C. Lynch, Attorney General, Edsel W. Haws and Elliott D. McCarty, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Michael Stepanian and Sherman Ellison for Real Parties in Interest.

Opinion

MOSK, J.—Defendants (real parties in interest herein) were charged by information with unlawful possession and transportation of marijuana. (Health & Saf. Code, §§ 11530, 11531.) Their motion to suppress the evidence on the ground of illegal search and seizure was granted, and the People seek review by statutory writ of mandate. (Pen. Code, § 1538.5, subd. (o).)

The sole witness testifying to the events in question was the arresting officer, Sergeant Cameron of the California Highway Patrol. Approximately 8 a.m. on a Sunday morning Officer Cameron was on duty in his marked patrol car on Interstate Highway 5 in Yolo County, when he observed a 1960 Pontiac automobile being driven southbound at a high rate of speed. He gave chase, and switched on his red emergency light for the purpose of bringing the car to a halt. The driver immediately began to pull over to the side of the road. At this point Officer Cameron saw a woman's head rise from the passenger portion of the front seat; she turned and put her arm over the back of the seat, then faced forward again, bent down toward the floor, and reassumed a normal sitting position. The driver of the Pontiac, defendant Martell Kiefer, alighted first and walked toward Officer Cameron. The officer told Mr. Kiefer why he had stopped him, and the latter readily acknowledged he had been speeding and produced his driver's license.

Officer Cameron then approached the passenger side of the Pontiac. The female occupant, defendant Patricia Kiefer, remained sitting in the front seat with the window rolled up. Officer Cameron made no attempt to communicate with Mrs. Kiefer, but immediately opened the car door next to her and looked inside. As he later testified, "My purpose was . . . several. One was to talk to the passenger and see what had been hidden and I was also concerned about my own safety."

Upon opening the door, Officer Cameron saw "some green-looking stems" lying on the floor mat between the seat and the door, and "several round seeds" in the crack of the seat cushion. Believing the latter to be marijuana, he ordered Mrs. Kiefer to step out and undertook a thorough search of defendants' car. Additional small quantities of marijuana were found in the glove compartment and in Mrs. Kiefer's purse.

The controlling issue in this proceeding is whether in the circumstances shown Officer Cameron's act of opening the door of defendants' car and looking inside was an unreasonable search within the meaning of the Fourth Amendment to the United States Constitution. We conclude that the question must be answered in the affirmative, and that the trial court correctly granted defendants' motion to suppress.

## I

It was stipulated at the suppression hearing that Officer Cameron did not have a warrant to search defendants' car; the burden to show proper justification for the search, accordingly, rested on the prosecution. (*Badillo v. Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

Having determined that defendants' car was being driven in excess of the posted speed limit, Officer Cameron had probable cause to stop the vehicle and arrest its driver for committing a misdemeanor in his presence. (Pen. Code, § 836, subd. 1.)[1] That fact alone, however, would not have justified a search of the vehicle as an "incident" to the traffic arrest. (*People v. Blodgett* (1956) 46 Cal.2d 114, 116 [293 P.2d 57]; cf. *People v. Weitzer* (1969) *supra*, 269 Cal.App.2d 274, 290 [75 Cal.Rptr. 318], and cases cited.) The latter rule has been more often stated than explained, and an analysis of its origin may prove instructive.

It is now settled that as an incident to a lawful arrest, a warrantless search limited both as to time (*Preston v. United States* (1964) 376 U.S. 364, 367-368 [11 L.Ed.2d 777, 780-781, 84 S.Ct. 881]) and place (*Chimel v. California* (1969) 395 U.S. 752, 762-763 [23 L.Ed.2d 685, 693-694, 89 S.Ct. 2034]) may be made (1) for instrumentalities used to commit the crime, the fruits of that crime, and other evidence thereof which will aid in the apprehension or conviction of the criminal; (2) for articles the possession of which is itself unlawful, such as contraband or goods known to be stolen; and (3) for weapons which can be used to assault the arresting

---

[1]The nature of the offense was such that an "arrest" on this ground would apparently have been limited by statute to a temporary detention of the driver until he identified himself and gave his written promise to appear. (See *People v. Weitzer* (1969) 269 Cal.App.2d 274, 294 [75 Cal.Rptr. 318], and authorities cited.)

officer or to effect an escape. (See generally *Warden* v. *Hayden* (1967) 387 U.S. 294, 300-310 [18 L.Ed.2d 782, 788-794, 87 S.Ct. 1642].)

█ In the case at bar we may quickly exclude the first of these three categories. Inasmuch as the "instrumentality" used to commit the offense of speeding is, if anything, the automobile itself, a search of any portion of its *interior* cannot be justified on this ground. (*Grundstrom* v. *Beto* (N.D.Tex. 1967) 273 F.Supp. 912, 916.) Moreover, there are no "fruits" of such an offense, and the "evidence" thereof is not subject to search and seizure as it consists essentially of the arresting officer's own observations and records. (*United States* v. *Tate* (D.Del. 1962) 209 F.Supp. 762, 765.)[2]

## II

Turning to the second of the above categories, we confront initially a more difficult question: If a police officer is ordinarily entitled to conduct a search for contraband as an incident to a lawful arrest, why has this rule been held inapplicable to routine traffic violations? When the officer, as here, has probable cause to arrest a driver for committing a traffic offense in his presence, why may he not search the offender's vehicle for contraband as an incident to that arrest? The answer deducible from the cases is that even when limited as required by *Preston* and *Chimel,* a search incident to an arrest must nevertheless remain "reasonable in scope." (*People* v. *Cruz* (1964) 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889].) █ As Justice White remarked in his dissent in *Chimel,* "The [Fourth] Amendment does not proscribe 'warrantless searches' but instead it proscribes 'unreasonable searches' " (395 U.S. at pp. 772-773 [23 L.Ed.2d at p. 700]). A search, therefore, "may be unreasonable and hence unlawful although incident to a lawful arrest." (*People* v. *Brown* (1955) 45 Cal.2d 640, 643 [290 P.2d 528], and cases cited.) "What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment: the history and the experience which it embodies and the safeguards afforded by it against the evils to which it was a response." (*Chimel* v. *California* (1969) *supra,* 395 U.S. 752, 765 [23 L.Ed.2d 685, 695], quoting from *United States* v. *Rabinowitz* (1950) 339 U.S. 56, 83 [94 L.Ed. 653, 669, 70 S.Ct. 430] (dissenting opinion of Frankfurter, J.).) The principal evil sought to be

---

[2]The foregoing analysis applies equally well, of course, to the vast majority of traffic offenses, including both "moving" and "equipment" violations. Among the few exceptions are the sanctions against driving while under the influence of alcohol or a narcotic: the presence of the latter substances in the vehicle is admissible as corroborating evidence of these crimes, and a reasonable search therefor may be conducted in the interior of the vehicle in which such an offender is apprehended, as an incident to that arrest. (*People* v. *Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].)

forestalled, of course, is the invasion of individual privacy by wholesale exploratory searches conducted under color of governmental authority. (*Warden* v. *Hayden* (1967) *supra*, 387 U.S. 294, 301 [18 L.Ed.2d 782, 788-789], and cases cited.) For this reason, "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 19 [20 L.Ed.2d 889, 904, 88 S.Ct. 1868]; accord, *People* v. *Collins* (1970) 1 Cal.3d 658, 661 [83 Cal.Rptr. 179, 463 P.2d 403].)

These rules govern the search of automobiles. In *Preston* v. *United States* (1964) *supra*, 376 U.S. 364, 368 [11 L.Ed.2d 777, 781], the defendants were arrested in their car on a charge of vagrancy, and a warrantless search thereof at a different time and place was held to be unreasonable. For the purposes of that opinion, the high court "assumed" there could be fruits or implements of the crime of vagrancy. In *Chambers* v. *Maroney* (1970) 399 U.S. 42, 47 [26 L.Ed.2d 419, 426, 90 S.Ct. 1975], however, the court acknowledged that in *Preston* "the arrest was for vagrancy; it was apparent that the officers had no cause to believe that evidence of crime was concealed in the auto." By contrast, in *Chambers* the police received a report of an armed robbery of a service station; eyewitnesses furnished detailed descriptions of the articles stolen, the garb and weapons of the robbers, and the appearance of the getaway car; and shortly thereafter the defendants were arrested in a vehicle precisely matching that description. Upholding on grounds of probable cause a delayed search of the automobile at the police station, the court noted that although the officers had probable cause for their warrantless arrest of the defendant, "the validity of an arrest is not necessarily determinative of the right to search a car if there is probable cause to make the search. Here, as will be true in many cases, the circumstances justifying the arrest are also those furnishing probable cause for the search." (399 U.S. at p. 47, fn. 6 [26 L.Ed.2d at p. 426].)

The contrary situation is presented, however, in the typical traffic violation case: there, the "circumstances justifying the arrest"—e.g., speeding, failing to stop, illegal turn, or defective lights—do *not* also furnish probable cause to search the interior of the car. In *Chambers* the arresting officers could reasonably expect to find weapons, clothing, loot, or other evidence of the robbery in the specifically identified vehicle in which the defendants were arrested; it was not unreasonable, therefore, to conduct a search for such items, and if contraband had been uncovered in the course of that search it could have been lawfully seized. But the arresting officer in a routine traffic case, as noted above, cannot reasonably expect to discover either instrumentalities or fruits or seizable evidence of the offense; still less does the arrest give him reasonable grounds to believe, without more, that the vehicle contains contraband. (Cf. *People* v. *Baca* (1967) 254

Cal.App.2d 428 [62 Cal.Rptr. 182] [probable cause to arrest defendant on charge of being a fugitive does not justify a search of the premises, as there is no "evidence" of that crime other than the defendant himself].) ██ It follows that probable cause to arrest a traffic offender, no matter how persuasive, is neither a necessary nor a sufficient condition for a warrantless search of his vehicle for contraband. To justify that search, there must be independent probable cause to believe the vehicle does in fact contain contraband.

Such a requirement fulfills the purpose of the Fourth Amendment, adverted to earlier, to protect individual privacy against indiscriminate governmental intrusions. In the leading case of *Carroll* v. *United States* (1925) 267 U.S. 132, 153-154 [69 L.Ed. 543, 551-552, 45 S.Ct. 280, 39 A.L.R. 790], the United States Supreme Court explained that "It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. . . . [T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." (Accord, *People* v. *Gale* (1956) 46 Cal.2d 253, 256 [294 P.2d 13].) It would not be significantly less "intolerable and unreasonable" if the police were authorized to search for contraband, without probable cause, every vehicle involved in a routine traffic violation. Millions of such vehicles are stopped every year,[3] and all but a small proportion are doubtless proceeding at the time on lawful business or innocent pleasure.

*Carroll* "merely relaxed the requirements for a warrant on grounds of practicability. It did not dispense with the need for probable cause." (*Henry* v. *United States* (1959) 361 U.S. 98, 104 [4 L.Ed.2d 134, 140, 80 S.Ct. 168].) The constitutional necessity for probable cause to search an automobile has not diminished in the years since *Carroll,* as the Supreme Court makes clear in its latest expression on the subject (*Chambers* v. *Maroney* (1970) *supra,* 399 U.S. 42, 48-50 [26 L.Ed.2d 419, 426-429]). And while the meaning of the phrase is defined in many intervening opinions, it has perhaps nowhere been better stated than in *Carroll* itself: there the high court held that the officers acted on probable cause because "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man

[3]In the fiscal year 1968-69, for example, a total of 3,453,680 charges of nonparking traffic violations were filed in the municipal courts of California alone. (Judicial Council of Cal., 1970 Ann. Rep., p. 165.)

of reasonable caution in the belief that [contraband] was being transported in the automobile which they stopped and searched." (267 U.S. at p. 162 [69 L.Ed. at p. 555].) Our task is to apply this test to the facts before us.

In the United States Supreme Court decisions finding probable cause to search an automobile, the basis for the officers' conduct has primarily been "reasonably trustworthy information" that the vehicle contained contraband. Thus in *Carroll* the officers knew from past experience that the defendants were in the bootlegging business at Grand Rapids; the defendants were observed returning to that city from the direction of Detroit, known to be a major source of illegally imported liquor; and the defendants were traveling "in the same automobile they had been in the night when they tried to furnish the whisky to the officers which was thus identified as part of the firm equipment." (267 U.S. at p. 160 [69 L.Ed. at p. 554]; see also *Husty* v. *United States* (1931) 282 U.S. 694, 700-701 [75 L.Ed. 629, 632-633, 51 S.Ct. 240, 74 A.L.R. 1407]; *Scher* v. *United States* (1938) 305 U.S. 251, 253 [83 L.Ed. 151, 153, 59 S.Ct. 174]; *Brinegar* v. *United States* (1949) 338 U.S. 160, 162-163 [93 L.Ed. 1879, 1883-1884, 69 S.Ct. 1302].) And in *Chambers* v. *Maroney*, as noted above, the officers acted on eyewitness descriptions of the robbers, their weapons and loot, and their getaway car.

In the case at bar Officer Cameron had no prior reliable information that defendants' car contained contraband. In fact he had neither seen nor heard of them until he stopped them for speeding. We add that such information would be rare in any routine traffic case, for the officer ordinarily issues the citation not because of the motorist's identity but because of the manner in which he was driving or the condition of his equipment. Indeed, even if the officer were looking for the specific driver because he knew of an outstanding warrant for his arrest on prior traffic charges, he would still lack—for the reasons analyzed above—probable cause to search the vehicle for contraband.

The second source of probable cause is facts or circumstances personally observed by the officer at the scene of the arrest: "A search for contraband is reasonable when conducted incident to a traffic violation only when the arresting officer observes *some occurrence other than the traffic offense itself* which reasonably leads the officer to believe that the motorist possesses contraband. . . . In the absence of *some fact* from which the officer can reasonably draw the belief that the motorist possesses contraband, a search for such articles is unreasonable." (Italics added.) (*Grundstrom* v. *Beto* (N.D.Tex. 1967) *supra*, 273 F.Supp. 912, 917.)

Most reliable of these circumstances is an observation, from outside the vehicle or other lawful vantage point, of contraband or suspicious objects

in plain view inside the vehicle. That observation is not itself a "search" in the constitutional sense (*Harris* v. *United States* (1968) 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992], and cases cited), but it may furnish probable cause to believe that additional contraband is secreted in the vehicle and to justify a search therefor. The rule has been applied to uphold warrantless searches of vehicles that were parked or otherwise immobilized (see, e.g., *People* v. *Terry* (1969) 70 Cal.2d 410, 428 [77 Cal.Rptr. 460, 454 P.2d 36], marijuana cigarette seen on dashboard; *People* v. *Muriel* (1968) 268 Cal.App.2d 477, 480 [74 Cal.Rptr. 44], narcotics paraphernalia visible on rear window deck; *People* v. *Samaniego* (1968) 263 Cal.App.2d 804, 811-812 [69 Cal.Rptr. 904], stolen auto parts seen in open trunk), as well as vehicles stopped by the police because of a routine traffic violation (see, e.g., *People* v. *Lopez* (1963) 60 Cal.2d 223, 241 [32 Cal.Rptr. 424, 384 P.2d 16], crowbar with distinctive paint marks seen protruding from under seat; *People* v. *Anderson* (1968) 266 Cal. App.2d 125, 132 [71 Cal.Rptr. 827], hand-rolled cigarette visible under front seat; *People* v. *Superior Court* (1968) 266 Cal.App.2d 685, 690 [72 Cal.Rptr. 261], marijuana seeds seen on passenger seat during safety inspection; *People* v. *Cacioppo* (1968) 264 Cal.App.2d 392, 395 [70 Cal. Rptr. 356], benzedrine capsules visible on floor; *People* v. *Ceccone* (1968) 260 Cal.App.2d 886, 890 [67 Cal.Rptr. 499], dexedrine capsules visible on floor).

In the present case the marijuana discovered by Officer Cameron was not visible from outside the vehicle, and did not come into view until he opened the door next to Mrs. Kiefer. Whether in the circumstances it was reasonable for him to open that door and look inside is an issue we shall explore *infra*.

The next group of relevant cases are those in which probable cause to search has been predicated on "furtive gestures" or "furtive movements" of an occupant of the vehicle. The theory, of course, is that although the officer does not actually *see* any contraband from outside the vehicle, he may reasonably *infer* from the timing and direction of the occupant's movements that the latter is in fact in possession of contraband which he is endeavoring to hide. From the viewpoint of the actor, the theory rests on a sound psychological basis: "It is a natural impulse on confrontation to hide immediately any contraband" (*People* v. *Jiminez* (1956) 143 Cal. App.2d 671, 674 [300 P.2d 68]). We can posit that sudden efforts at concealment, like flight from the scene of a crime, may well be expressions of consciousness of guilt. On the other hand, the same motion may in fact have an entirely innocuous purpose: "It is recognized that a person's reasons for concealment may run the whole spectrum from the most legitimate

motives to the most heinous" (*People* v. *Weitzer* (1969) *supra*, 269 Cal. App.2d 274, 292).[4]

The difficulty is that from the viewpoint of the *observer*, an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious.

■ It is because of this danger that the law requires more than a mere "furtive gesture" to constitute probable cause to search or to arrest. The United States Supreme Court recently reaffirmed this rule in the case of *Sibron* v. *New York* (1968) 392 U.S. 40, 66-67 [20 L.Ed.2d 917, 937, 88 S.Ct. 1889]: "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime*, they are proper factors to be considered in the decision to make an arrest." (Italics added.) That knowledge, of course, may be derived from the usual twin sources of information and observation; stating the rule for California, the court in *People* v. *Tyler* (1961) 193 Cal.App.2d 728, 732 [14 Cal.Rptr. 610], declared: "As it is the information known to the police officers or the suspicious circumstances which turn an ordinary gesture into a furtive one, it is equally clear in this state that in the absence of information or other suspicious circumstances, a furtive gesture alone is not sufficient. . . ." (Accord, *People* v. *One 1958 Chevrolet Impala* (1963) 219 Cal.App.2d 18, 20 [33 Cal.Rptr. 64].)

From a review of the cases and other authorities we are constrained, unfortunately, to conclude that the foregoing rule has more often than not been honored only in the breach. In this opinion we do not undertake an all-inclusive review of the many gestures which have been deemed "furtive," or of the differing congeries of circumstances which have been held to raise those gestures to the dignity of constitutionally adequate probable cause.

---

[4]As we observed in holding that the act of slamming an apartment door in a policeman's face does not per se furnish probable cause to arrest, "There are many reasons other than guilt of a felony why an occupant of an apartment may not wish himself or others present exposed to the immediate view of a stranger, even if the stranger is a police officer." (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113]; accord, *People* v. *Shelton* (1964) 60 Cal.2d 740, 747 [36 Cal.Rptr. 433, 388 P.2d 665].).

Nevertheless, the fact situation now before us recurs with some frequency, and future rulings on other "furtive gestures" should be characterized by more reflective analysis.

A few distinguishable examples will serve to set the scene. ▮ A furtive gesture coupled with prior reliable information may constitute probable cause. (*People* v. *Jiminez* (1956) *supra,* 143 Cal.App.2d 671, 673, downward motion of a juvenile sitting with others in a car parked in an area where officers had been told to expect a gang fight.) Probable cause may also be predicated on a furtive gesture coupled with an actual observation of contraband in the portion of the vehicle to which the gesture was directed. (*People* v. *Mosco* (1963) 214 Cal.App.2d 581, 585-586 [29 Cal.Rptr. 644], downward motion of an occupant of a parked car, followed by the officer's observation of a marijuana cigarette under the seat). And the officer need not even see recognizable contraband so long as he observed the suspect in the act of deliberately hiding a package or box which, in the circumstances, it is reasonable to believe contains contraband. (*People* v. *Doherty* (1967) 67 Cal.2d 9, 21-22 [59 Cal.Rptr. 857, 429 P.2d 177], defendant and others refused to leave a service station at 3 a.m.; when officers arrived and asked for identification, defendant was seen to take a small white package from his pocket and drop it into the open motor of a parked car; *People* v. *Superior Court* (1969) 272 Cal.App.2d 383, 387 [77 Cal.Rptr. 646], car stopped for driving without lights at 2 or 3 a.m.; defendant bent forward and officers saw him push a small white box under the front seat.)[5]

In each of the foregoing cases the gesture of the suspect could reasonably be given a guilty connotation from prior reliable information or from the

---

[5]Although a closer case on its facts, *People* v. *Blodgett* (1956) *supra,* 46 Cal.2d 114, may fairly be put in this category. There the defendant and his two companions were seated in a taxicab double-parked in front of a hotel at 3 a.m. Police officers had been observing the cab, and decided to investigate. They ordered the occupants out, and as one of the officers opened the left rear door "he saw defendant withdraw his left hand from behind the seat at the juncture of the seat and back cushion." The officers searched the seat and found three marijuana cigarettes in the area from which the defendant had taken his hand. Affirming a judgment of conviction of possession of marijuana, this court reasoned (at p. 117) that although the search could not be predicated on a traffic arrest for double parking, "It was justified, however, on another ground. There is nothing unreasonable in an officer's questioning persons outdoors at night [citations], and in view of the hour and the unusual conduct of the occupants of the cab it was not unreasonable for the officers to order them to get out of the cab for questioning. Since Officer Barker saw defendant's furtive action in getting out, he had reasonable grounds to believe that he was hiding contraband and the search of the cab was therefore reasonable."

Thus, although the officer did not actually see the defendant thrust his hand *into* the space between the seat and the back cushion, it was more likely than not that the defendant's observed motion of taking his hand *out of* that space was the end of such a sequence. That inference, at least, was quite as plausible as the defendant's belated

officer's personal observation of contraband or a deliberate act of concealment under otherwise suspicious circumstances. It is true that to reach a conclusion of probable cause in each instance the officer was required to draw certain inferences from the known facts; but the inferences were eminently reasonable, and the chain of his deductions was correspondingly strong and compelling. A far different picture emerges, however, from a series of Court of Appeal decisions on facts similar to those now before us: in a number of such cases the evidence assertedly giving sinister meaning to the "furtive gesture" has been so thin as to stretch that chain almost to the breaking point.

The first of the series—and typical of many—was *People* v. *Sanson* (1957) 156 Cal.App.2d 250 [319 P.2d 422]. There the officer observed an automobile being driven "very slowly" on a street in Venice, California, at 3 a.m.; he also noted there was no license plate illumination, and the taillight was blue instead of red. After following the car for five minutes he turned on his red emergency light in order to bring it to a stop. When he did so he saw, as he later testified, that the two passengers "appeared to be hiding something under the front seat." The officer went to the door on the passenger side and opened it; the passengers exited, and the officer "looked under the seat to see what they had placed there." Finding a dirty paper bag, he proceeded to open it and look inside. The bag contained marijuana. The two passengers were subsequently charged with possession of that substance; they moved to set aside the information on the ground the officer had no probable cause to search the car, and hence that the evidence was illegally obtained. The trial court granted the motion, and the People appealed.

The Court of Appeal reversed, holding the evidence admissible. The opinion begins (at p. 252) by characterizing the facts as "strikingly similar" to those of *Blodgett;* as noted above (*ante,* fn. 5), the analogy is untenable. The court then stated (at p. 253) that the defective lights on the defendants' car gave the police cause to cite the driver for equipment violations but not to search the vehicle; that the police were justified in turning on their red light for the purpose of stopping the defendants' car; and "This signal re-

story at the police station that he had "pushed back" on the seat "to raise himself." In the light of the lateness of the hour and the unusual conduct of the occupants of the cab, the officer could reasonably conclude that in thrusting his hand in and out of that space the defendant had been attempting to secrete contraband.

As will appear, a number of Court of Appeal decisions have purported to extend *Blodgett* to the fact situation now before us. That reliance, however, is improper. In contrast to the unusual movement observed in *Blodgett,* the act of simply bending forward or downward in the front seat of an automobile has, as we will show, many more innocent than culpable interpretations. *Blodgett* is therefore not authority for the proposition that such an act ipso facto furnishes probable cause to search for contraband. To avoid similar confusion in the future, it will be well to limit *Blodgett* to its facts.

vealed to the defendants that police officers were at hand and desired to question them."

At this point in the opinion, however, the reasoning of the Court of Appeal suddenly shifts from a proper analysis of the facts observed by the officers to an improper speculation on the defendants' motives: "*Conscious of* the presence of the narcotic and *fearing* they would be apprehended for its possession, defendants immediately made movements, as did the defendant in the Blodgett case, which led the police to believe that they were hiding something under the front seat. . . . The significance of the movements of the defendants is that they were made immediately upon *realizing* they were to be confronted by the police. The defendants were simply exercising 'a natural impulse' [citing *People* v. *Jiminez, supra*]." (Italics added.) (*Id.* at p. 253.)

The fatal defect in this reasoning is that neither the Court of Appeal nor, indeed, the arresting officer had any knowledge of what the defendants "realized," were "conscious of" or "feared," or what "impulse" they felt. To be sure, with the advantage of hindsight such speculation is not implausible. But a search cannot be justified by what it turns up (*People* v. *Brown* (1955) *supra*, 45 Cal.2d 640, 643-644, and cases cited), and probable cause cannot be based on a belated interpretation of the suspect's conduct which appears reasonable only in the light of evidence uncovered in that very search.

The *Sanson* approach also violates the broader rule that probable cause to arrest or to search must be tested by "facts which the record shows were known to the officers at the time the arrest [or search] was made." (*People* v. *Talley* (1967) 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564].) In the typical case, an officer on patrol observes a motorist commit a routine traffic violation, and turns on his siren or red light to stop the violator's car and issue a citation; upon giving such a signal, the officer sees the driver or other occupant of the car suddenly "lean forward" or "bend down" or otherwise reach toward the dashboard or floor. Assuming these are the only "facts known to the officer" at that moment, do they give him probable cause to believe that the person he observed moving in the car is in possession of contraband? Careful analysis reveals there are too many weak links in the officer's chain of deductions to support that conclusion. The flaws may be conveniently grouped around two assumptions.

First, the argument assumes that the movements in question were purposeful responses to the officer's appearance on the scene. But the person observed might not in fact have seen the police car, in which event any movements he made would be irrelevant. If he did see a vehicle following, he might not have recognized it to be a police car; many of the "furtive gesture" cases have arisen in the dark of night, with the officer's car some distance

behind. If he recognized it as such, he might not have understood that the police were attempting to bring his own car to a halt. If he correctly inferred the intent of the police, his movements might not have been made in *response* to that awareness; they might simply have been movements he was on the point of making in any event. And if his movements were responsive to the situation, they still might not have been *purposeful*: i.e, when suddenly facing an imminent confrontation with the police for some unknown misdeed, many citizens with nothing to hide will nevertheless manifest an understandable nervousness by means of random, undirected gestures or movements.

Secondly, the argument assumes that only the guilty will react in the described manner to a policeman's signal to stop their car. The reported opinions make much of the "fact" that the claimed furtive gestures were not seen to occur *until* the officers turned on their red light or siren. (See, e.g., *People* v. *Sanson* (1957) *supra,* 156 Cal.App.2d 250, 253: "No such movements appear to have been made by any of [the defendants] during the previous period the police had their car under surveillance.") As explained above, this sequence could be entirely fortuitous; indeed, in certain cases the movements could have preceded the officer's pursuit but not been visible until he drew closer for the purpose of stopping the car. But even assuming that this chronology also evidences a causal nexus—post hoc, ergo propter hoc—the analysis does not end there. Reflection will suggest many more innocent than guilty explanations for a motorist's act of "leaning forward" or "bending down" in the circumstances at hand.

To begin with, every motorist knows that the approaching police officer will in all likelihood ask to see his driver's license, and probably also the registration card of the car. The observed movement, therefore, might well be nothing more than the driver's act of reaching for his wallet so as to have his license ready for inspection, or reaching for the steering post or glove compartment to obtain the registration card. And as many women drivers keep their handbag—containing their license and other identification—next to them on the floor or between the seats, a reaching motion in that direction would be no less natural for them.

Furthermore, every motorist knows that the officer will wish to speak with him, however briefly; simple preparations for that conversation are therefore to be expected. It may be necessary, for example, for the driver to roll down his window. If the radio is playing at the time, the driver or a passenger might lean forward to reduce the volume or turn off the set.[6] If the driver was smoking, he might well reach down to extinguish or store his cigarette in

---

[6]This very explanation was given by the defendant in at least two of the reported cases. (*People* v. *Goodrick* (1970) 11 Cal.App.3d 216, 219 [89 Cal.Rptr. 866]; *People* v. *Cruz* (1968) 264 Cal.App.2d 437, 440 [70 Cal.Rptr. 249].)

the car's ashtray.[7] And if an occupant of the vehicle was consuming food or beverages, similar movements would probably follow.[8]

Additionally, many motorists expect to alight from their car, whether voluntarily or upon request, when they are stopped by the police. Again, certain preparations are usually in order: seat belts may have to be unbuckled; passengers may have to remove road maps, packages, folded coats, or infants from their laps; and clothing may have to be adjusted, shoes or hats put on, belts tightened, and outer garments buttoned.

Finally, when a driver stops his car in a situation in which he knows he may alight from the vehicle, it is both customary and prudent for him to apply his parking brake. Indeed, the law forbids anyone in control of a motor vehicle to "permit it to stand on any highway unattended without first effectively setting the brakes thereon" (Veh. Code, § 22515; see also § 26450, requiring such a parking brake system). Yet in many automobiles the parking brake handle or lever is on or below the dashboard, and the driver is therefore compelled to lean forward or downward in order to apply it.

Each of the foregoing gestures in some degree resembles—and could reasonably be mistaken for—the movements of a person engaged in secreting contraband inside a car.[9] Yet each is wholly innocent, and has been made at one time or another by virtually every driver or passenger on the roads today. Accordingly, in the language of *Carroll,* such gestures are not "sufficient in themselves to warrant a man of reasonable caution in the belief that [contraband] was being transported" in the vehicle under observation.

The leading decision so holding is *People* v. *Moray* (1963) 222 Cal.App. 2d 743 [35 Cal.Rptr. 432]. There the defendant driver failed to stop his car at a posted sign and made a left turn from the wrong lane; the officer turned on his red light and signalled the defendant to pull over; and as the latter did

---

[7]In *People* v. *Shapiro* (1963) 213 Cal.App.2d 618, 620 [28 Cal.Rptr. 907], the driver explained that as she brought her car to a halt she dropped a cigarette she had been smoking and bent down to pick it up.

[8]In *Hassell* v. *Superior Court,* 2 Civ. 36207 (petition for hg. den. by div. ct., by minute order of May 6, 1970), the driver testified that while he was pulling over in response to the officers' signal a can of Coca-Cola which he had been holding between his legs spilled over him and the seat, and he took the can and put it down on the floor on the passenger side.

[9]The officer's limited opportunity to observe such gestures should be borne in mind. He views them not only from outside the suspect's car but also (1) from one car to another while both are moving, (2) at a time when a traffic offense has been committed, the vehicles are maneuvering to the side of the road, and the officer will properly be concerned for his own safety and that of others, and (3) most commonly in the nighttime, as noted elsewhere in this opinion. In the case at bar, the observation was made when the officer was 100 to 200 feet behind the defendants' car.

so the officer saw him "raise his right shoulder as if he were reaching in his pocket, and then lean towards the right hand seat." The officer asked the defendant "what he had hidden underneath the seat," and the defendant answered "nothing." The officer nevertheless ordered the defendant out of the car, searched it, and found a small package of marijuana under the front seat. Reversing a conviction of possession of that substance, the Court of Appeal reasoned (at p. 746): "There is nothing in the record here to indicate that defendant was attempting to hide anything—he was not a narcotics addict, nor was he suspected of being such—the officer had never seen the defendant, nor his car, before. The defendant's automobile was not listed on any 'hot sheet.' The officer did not see the defendant's hands. In effect all that the officer saw was an arm motion. The defendant might have been scratching himself, he might have been reaching for his wallet with his identification and documents therein or he might have been simply changing his physical position, none of which activities would seem to be a reasonable cause to suspect him of committing a felony."

Noting there were no other suspicious circumstances, the court concluded (at p. 747), "If the conduct set forth in the record in this case were to constitute probable cause for a traffic officer to believe that a felony has been committed and that a search of the motorist's vehicle is authorized, then practically every motorist in California who receives or is about to receive a traffic citation will be subject to having his person and his automobile searched by the traffic officer—such is fortunately not the law."[10]

*Moray* and *Cruz* aside, however, every Court of Appeal decision on this topic beginning with *Sanson* has found sufficient other "facts" in the record to impart a guilty connotation to the furtive gesture now engaging our atten-

---

[10]*Moray* was followed in *People* v. *Cruz* (1968) *supra*, 264 Cal.App.2d 437. In that case the defendant was driving an automobile with an unlawfully lowered frame; the officer turned on his red lights, and observed the defendant suddenly lower his right shoulder, look to the left, and "appear" to be reaching toward the seat or floor of the car. The officer asked the defendant what he had put under the front seat, but defendant shrugged and made no reply. The officer then ordered the defendant out of the car, searched it, and found several packages of benzedrine tablets under the seat. Reversing a judgment of conviction of possession of that drug, the Court of Appeal reasoned (at p. 441): "Nothing of a suspicious character was visible to the officer when he stood beside the defendant's vehicle. The record does not disclose that Officer Lee had any background of experience in narcotics violations except some instruction training at the police academy. The defendant was not known to Officer Lee at the time he stopped him as having any connection with the illicit traffic in narcotics. There was no evidence to indicate that Officer Lee suspected that the motion he observed was connected with the disposition of contraband narcotics. For all the record discloses, the officer's inquiry as to what had been hidden did not direct itself specifically to narcotics but was prompted by a general curiosity to ascertain what, if anything, was within the defendant's vehicle. We are of the opinion that there was insufficient evidence to support probable cause to search the vehicle for contraband narcotics."

tion.[11] Of the various circumstances stressed in the cited cases, perhaps the most persuasive is a driver's failure to stop his car promptly when a police officer signals him to do so. Even this fact, however, is subject to interpretation. Little difficulty is experienced when the motorist in this situation continues to drive for a substantial distance and makes sharp turns or other unusual maneuvers (*Gil, Chevrolet Impala*); such conduct can fairly be deemed evasive action, implying consciousness of guilt. Yet in other instances a delay in stopping may well be reasonable. It is a motorist's duty to use due care at all times, and when requested to pull over by a police officer he should do so at the first *safe* opportunity. But road conditions, speed, or other traffic may sometimes compel him to proceed a short way before bringing his car to a halt. (See, e.g., *People* v. *Moray* (1963) *supra,* 222 Cal.App. 2d 743, 744, upon being signalled to stop, the defendant "parked at the first available parking space.") The line may be a fine one in certain cases (*Bergeron, Brown*), but it must be drawn realistically and in light of all the facts.

A second circumstance noted in virtually each of the cited cases (with the exception of *Williams* and *Gil*) is that the confrontation took place in the nighttime. Here, however, the possibility of mistake is greater. As distinguished from a deliberate delay in stopping his car, the fact that it is night when the police appear is not "conduct" of the motorist "in response to" the officer's signal. The significance of this fact should therefore be appraised with caution; it does not, without more, transform an innocent gesture into a culpable one furnishing probable cause to search. As long ago as *People* v. *Simon* (1955) 45 Cal.2d 645, 650-651 [290 P.2d 531], we acknowledged, "There is, of course, nothing unreasonable in an officer's *questioning* persons outdoors at night" (italics added). Recognizing, however, that in our society it is not a crime for a citizen to be out after dark, we held that "to permit an officer to justify a search on the ground that he 'didn't feel' that a person on the street at night had any lawful business there would expose anyone to having his person searched by any suspicious officer no matter how unfounded the suspicions were. Innocent people, going to or from evening jobs or entertainment, or walking for exercise or enjoyment, would suffer along with the occasional criminal who would be turned up." These dangers are no less real today.

---

[11]Our research has disclosed the following cases in point: *People* v. *Cantley* (1958) 163 Cal.App.2d 762 [329 P.2d 993]; *People* v. *Williams* (1961) 196 Cal.App.2d 726 [16 Cal.Rptr. 836]; *People* v. *Shapiro* (1963) *supra,* 213 Cal.App.2d 618; *People* v. *One 1958 Chevrolet Impala* (1963) *supra,* 219 Cal.App.2d 18; *People* v. *Gil* (1967) 248 Cal.App.2d 189 [56 Cal.Rptr. 88]; *People* v. *Wigginton* (1967) 254 Cal.App.2d 321 [62 Cal.Rptr. 104]; *People* v. *Brown* (1969) 272 Cal.App.2d 448 [77 Cal.Rptr. 438]; *Bergeron* v. *Superior Court* (1969) 2 Cal.App.3d 433 [82 Cal.Rptr. 711]; *People* v. *Sirak* (1969) 2 Cal.App.3d 608 [82 Cal.Rptr. 716]; *People* v. *Goodrick* (1970) *supra,* 11 Cal.App.3d 216.

Other circumstances mentioned with varying emphasis in the cited cases as bearing on the question whether the "furtive gesture" had a criminal connotation include the remoteness of the area where the confrontation took place (*Brown*), a report of a recent crime of violence in the neighborhood, with a description of the suspect (*Cantley*), a damaged condition of the car giving ground for belief it might be stolen (*Wigginton*), the motorist's lack of a driver's license and other identification (*Goodrick*), erratic or dangerous driving by the operator of the suspected car (*William, Shapiro, Sirak, Goodrick*), and "nervousness" of the motorist while under police investigation (*Gil*).

We do not pause to examine each of these circumstances individually, although we note that some are considerably less persuasive than others. "Erratic driving," for example, may well be evidence of alcoholic or narcotic intoxication of the driver; but it may also be caused by the actions or sudden appearance of the police themselves. Thus in *Goodrick* the officers observed a car driving with only one headlight, and gave chase after turning on their spotlights and red emergency lights. The driver, a woman, was seen to lean forward to the right, but promptly pulled over to the side of the road. As she came to a stop, however, her right front wheel "jumped the curb." The Court of Appeal attributed multiple sinister meanings to the latter event—"a circumstance reasonably calculated to generate suspicion that the driver failed to properly control the vehicle either because of the influence of narcotics or alcohol or because of unfamiliarity with a stolen vehicle or because of her preoccupation with an urgent need to conceal contraband." (11 Cal.App.3d at p. 219.) We find equally plausible the driver's simple explanation (*id.* at pp. 218-219) that "Upon observing the lights of the sheriff's car, she reached down with her right hand to turn off the radio and ran over the curb because the spotlights from the police car were blinding her."[12]

A final word must be said about the "fact" stressed in several of the cases (*Williams, Brown, Chevrolet Impala*) that upon stopping his vehicle the driver alighted first and walked back to the police car, rather than waiting for the officers to come to him. We do not know whether, as the court asserts in *Williams* (196 Cal.App.2d at p. 728), it is "the customary thing" for a motorist to sit and wait for the officers to approach his car, and we doubt

---

[12]Similarly, the fact that the motorist appeared to be rendered "nervous" by the arrival of the police is of little materiality in all but unusual cases. Here, Officer Cameron testified that "it isn't unusual" for passengers to "look back" when he approaches their car from behind, and when a speeding arrest is made "some people appear nervous, as passengers, and some people don't" and the same is true of drivers. Such nervousness, we noted above, is a natural response to the stress situation presented; even in conjunction with "furtive movements," it fails to distinguish those who are guilty from "any other harried citizen" (*People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 96 [41 Cal.Rptr. 290, 396 P.2d 706]).

there are either statistics or consensus of opinion on the point. But we dispute the conclusion of the *Williams* court that when the motorist adopts the opposite course and himself walks to the police car, he does so to decoy the officers away, "evidently hoping that they would not have an opportunity to look into his car." (*Ibid.*) We easily conceive of a variety of wholly innocent —and equally if not more "evident"—motives for such conduct by a motorist, not the least of which is a natural desire to be or to appear cooperative and otherwise ingratiate himself with the officers who have stopped him.

Our list of various elements which have contributed to the finding of probable cause in "furtive gesture" cases is intended to be illustrative rather than exhaustive. In analyzing these elements separately, moreover, we do not mean to depart from the settled rule that "There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]—and on the total atmosphere of the case. [Citations.]" (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) We also agree that "The rule should not be understood as placing the ordinary man of ordinary care and prudence and the officer experienced in the detection of narcotics offenders in the same class. Circumstances and conduct which would not excite the suspicion of the man on the street might be highly significant to an officer who had had extensive training and experience in the devious and cunning devices used by narcotics offenders to conceal their crimes." (*People* v. *Williams* (1961) *supra*, 196 Cal.App. 2d 726, 728; accord, *People* v. *Cowman* (1963) 223 Cal.App.2d 109, 117-118 [35 Cal.Rptr. 528].)

Even so, we will not countenance abuses of that experience. The near-insufficiency of the evidence of probable cause upheld in certain of the cited Court of Appeal decisions suggests that police reliance on so-called "furtive movements" has on occasion been little short of a subterfuge, and that in order to conduct a search on the basis of mere suspicion or intuition, guilty significance has been claimed for gestures or surrounding circumstances that were equally or more likely to be wholly innocent. A recent study indicates that our concern in this regard may be well-founded.[13] ■ The solution,

---

[13]In *Marijuana Laws: An Empirical Study of Enforcement and Administration in Los Angeles County* (1968) 15 U.C.L.A. L.Rev. 1499, 1533-1535 (fns. omitted), the authors observe that "A large percentage of the arrests for marijuana possession results from the stopping of automobiles for minor traffic violations, with the subsequent discovery of marijuana either in the car or on the person of one of the passengers. The most common of these stops are for a missing taillight or for an unilluminated rear license plate." It is recognized that such a violation does not alone furnish probable cause to search the automobile, but the authors continue: "The furtive motion authorizing a search usually results as the officer is pulling a car over for a minor traffic violation. The arrest reports typically state that as he shined his lights on the back of the car, the patrolman saw one of the occupants make a 'furtive motion' as if to hide or throw away something. A few appellate decisions indicate

as it has always been, is simply to insist upon good-faith compliance with the Constitution: the police officer should remember there is no substitute for patient and thorough investigation, and should avoid drawing a hasty or pre-conceived conclusion that the movements he observes are prompted by guilty motives; the trial court ruling on the issue of probable cause should make an independent and dispassionate judgment on the basis of common sense and in the light of all the circumstances presented as of the time of the event; and the appellate court, while giving due deference to the trier of fact's determination of the weight and credibility of the testimony, and affirming the ruling if there is substantial evidence to support it, should keep firmly in mind the high purpose of the Fourth Amendment and remain ever vigilant to forestall any encroachment on its fundamental guarantees.

Turning to the facts of the case before us, we find only that (1) Mrs. Kiefer made a "furtive gesture" toward the seat or the floor of defendants' automobile, and (2) Mr. Kiefer walked back to Officer Cameron's car rather than wait for the officer to come to him. For the reasons stated above, Mrs. Kiefer's gesture alone is insufficient to constitute probable cause to search, and Mr. Kiefer's walk toward the police car cannot reasonably be deemed to invest her gesture with guilty significance. It follows that Officer Cameron could not lawfully search defendants' vehicle for contraband.

## III

The third category of articles which may be the object of a search incident to a lawful arrest is weapons: "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist or effect his

that something additional, such as evasive action by the driver, must be present before the police have probable cause to search. Usually, however, the judge accepts the furtive gesture alone as being sufficient. This provides the police officer with an almost irrefutable method to 'write-in' probable cause, although some attorneys have successfully gone to great lengths to prove that the officer could not have seen inside the car from his vantage point. Even accepting that the policeman did see the furtive motion, however, a sudden movement inside a car is open to a variety of interpretations and [inferences]. It is thus questionable whether such a movement satisfies the high degree of probability which has been required for probable cause in other areas." To the suggestion that probable cause can be "written in" the record of the case by this technique, the authors add (at p. 1534, fn. 95): "The suspicion that this does occur is heightened by the almost total uniformity of the arrest reports. The traffic officer appears to be aware that if he tailors his report to a certain style with certain facts, he will almost certainly have it accepted by the court." Summing up, the study points out (at p. 1533) that "The nagging question in all these situations is whether the police are truly interested in the conduct justifying the investigation or whether they are using that conduct merely as an excuse for investigating some other activity for which they have no legal basis. To the extent that the police use these procedures as a subterfuge to uncover marijuana use, they have effectively created a new 'method' of marijuana enforcement." That method, manifestly, is unconstitutional.

escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated." (*Chimel* v. *California* (1969) *supra*, 395 U.S. 752, 762-763.)

We are not unmindful of the dangers daily faced by the men who bear the burden of policing our streets and highways, and of the fact that even a minor traffic citation incident can occasionally erupt into violence. We agree with the United States Supreme Court that "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives." (*Terry* v. *Ohio* (1968) *supra*, 392 U.S. 1, 23-24 [20 L.Ed.2d 889, 907].) The courts should do all in their constitutional powers to minimize these risks.

Yet in *Terry* the high court held that when an officer observes suspicious behavior short of probable cause to arrest, he may conduct a "pat-down" search for weapons only if he has reasonable grounds to believe the suspect is "armed and presently dangerous." (*Id.* at pp. 24, 27, 30 [20 L.Ed.2d at pp. 907-908, 909, 911].) ▮ The requirements for a weapons search are not as strict if the officer has probable cause to arrest (*id.* at p. 25 [20 L.Ed.2d at p. 908]); but for the reasons explained in Part II of this opinion, even a search incident to such an arrest must remain "reasonable in scope."

That scope, moreover, is dictated by similar considerations. Just as the arresting officer in an ordinary traffic violation case cannot reasonably expect to find contraband in the offender's vehicle, so also he cannot expect to find weapons. To allow the police to routinely search for weapons in all such instances would likewise constitute an "intolerable and unreasonable" intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile. ▮ It follows that a warrantless search for weapons, like a search for contraband, must be predicated in traffic violation cases on specific facts or circumstances giving the officer reasonable grounds to believe that such weapons are present in the vehicle he has stopped.

No such facts or circumstances appear in the record of the case at bar. Mrs. Kiefer's act of bending down and Mr. Kiefer's walk toward the officer's car are clearly insufficient for this purpose: if, as we conclude in Part II, those observations did not give Officer Cameron reasonable grounds to believe there was contraband in the car, by the same token they could not reasonably justify a belief that the same persons were in possession not of contraband but of weapons.

Neither the officer on the stand nor the Attorney General in his briefs has directed our attention to any other suspicious facts or circumstances. To be sure, Officer Cameron testified that he opened the door next to Mrs. Kiefer in part because "I was concerned about my own safety," adding that "I feel it is important to be able to see a person you are talking to, and their hands, and so forth, and when you have a furtive activity seen, you want to see the person." On its face, this concern is quite comprehensible. (Compare *People* v. *Davis* (1961) 188 Cal.App.2d 718 [10 Cal. Rptr. 610].) But additional facts brought out at the hearing demonstrate the unreasonableness of Officer Cameron's conduct in this case. The stopping of defendants' automobile, it will be remembered, occurred in broad daylight and on the open highway; Mr. Kiefer took no evasive action whatever, but promptly pulled his car to the side of the road. Officer Cameron conceded on cross-examination that he had received no reports of burglaries, robberies, or any other crime of violence in the area; that he had no information of any kind bearing on the Kiefers; and that Mr. Kiefer was cooperative, produced his license, and "was pretty straight and admitted he was going fast"—an admission which the officer felt was "not unusual." At that point any suspicion still harbored by Officer Cameron must have been slight indeed. Yet even then he failed to take a number of more reasonable steps to allay it: he did not ask or signal Mrs. Kiefer to roll down her window, nor did he give her a chance to do so on her own initiative; he did not ask her to explain the movement he had observed, nor to show him what if anything she had in her hands; and he did not request her to alight from the vehicle for further investigation (see *People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]). Instead, he seized the door next to her, pulled it open, and looked inside the car.

Finally, it may be doubted in any event whether Officer Cameron was truly concerned that defendants might be armed with weapons they could use against him. He conceded that throughout his confrontation with Mrs. Kiefer he had his back turned to her husband, whom he had not searched but had left standing "somewhere" at the rear of the automobile. "To say that the officer who turns his back on the driver whom he has arrested, while he first searches the driver's automobile is conducting a reasonable search incident to the arrest and not conducting an exploratory search staggers the credulity of anyone who pauses to examine the reasoning." (*Grundstrom* v. *Beto* (N.D.Tex. 1967) *supra,* 273 F.Supp. 912, 918, quoting from *Lane* v. *State* (Tex.Crim.App. 1967) 424 S.W.2d 925.)

This inference is supported by the fact that Officer Cameron did not even claim he suspected the presence of narcotics in defendants' car, saying only that he wanted to "see what had been hidden" by Mrs. Kiefer.

But a search "prompted by a general curiosity to ascertain what, if anything, was within the defendant's vehicle" (*People* v. *Cruz* (1968) *supra,* 264 Cal.App.2d 437, 441) is manifestly exploratory in nature, and violates both the letter and the spirit of the Fourth Amendment.

As Officer Cameron's initial entry into defendants' car was unlawful, all the evidence discovered as a consequence of that entry was inadmissible. It follows that the trial court's order of suppression is supported by substantial evidence.

The alternative writ of mandamus is discharged and the peremptory writ is denied.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would grant the writ.