[Crim. No. 20143. Second Dist., Div. Four. Feb. 23, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
SEYMOUR JOSEPH CASSEL et al., Defendants and Appellants.

## COUNSEL

Luke McKissack for Defendants and Appellants.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Gaye W. Herrington, William R. Pounders and Bernardine M. Baldwin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON, Acting P.J.**—Defendants were charged by information in count I with possession of a narcotic, to wit, cocaine, in violation of section 11500 of the Health and Safety Code and in count II with possession of marijuana, in violation of section 11530 of the Health and Safety Code. Each of defendants' motions under sections 995 and 1538.5 of the Penal Code were denied.

Each defendant personally waived jury trial and their causes were submitted to the court pursuant to stipulation, on the proceedings had at the preliminary examinations, each party reserving the right to additional evidence at the time of trial.

The court found each defendant not guilty on count I and guilty as charged in count II.

Each defendant's motion for new trial was denied and each defendant was given a one-year county jail sentence which was suspended on a grant of probation for a two-year period with the provision, inter alia, that each pay a fine in the sum of $200 plus penalty assessment.

Defendants attempt to appeal from the order denying their motions to suppress under Penal Code section 1538.5 and from the orders denying new trial motions. These are nonappealable orders. We treat the purported

appeals from the motions and orders as appeals from the orders granting probation. (Cal. Rules of Court, rule 31(b).)

On April 27, 1970, Prentiss Frost was employed by the U.C.L.A. Police Department as a patrol officer. While on patrol at 3:45 a.m. on that day he observed a 1965 Mercedes automobile being driven eastbound on LeConte Avenue near Westwood Boulevard. He stopped the vehicle because a white light was showing instead of a red right rear taillight. He considered this a violation of section 25950, subdivision (b) of the Vehicle Code. As he approached the vehicle, he observed the two defendants, husband and wife, seated in the rear passenger seat. Defendant Seymour was seated on the left hand side and his wife on the right hand side.

The officer signaled the driver to stop and he asked for and received from him a California operator's license. The officer inquired if the driver was the owner of the Mercedes. The defendant responded from the back seat, advising the officer that he was the owner and that his friend was merely driving his automobile. The officer then asked defendant Seymour to step from the vehicle in order that he point out to the owner the nature of the violation. The defendant stepped from the automobile and walked to the rear, a distance of 4 feet. He looked at the light and quickly got back into the car, slamming the rear door. As defendant Seymour re-entered the automobile, he "made a quick fast movement with his right hand," and he appeared to place an object in the crevice of the seat between him and his wife. However, the officer testified that he did not see anything in defendant's hand.

The officer then directed the four persons to get out of the car, so he could search for weapons. The officer testified that he wanted to search "for the possibility of a stash of property or narcotics in the vehicle or having a weapon."

After the defendant got out of the car, the officer said he was "going to make a search of him for a possibility of concealed weapon and of the driver." Defendant Seymour stated, "Man, you're not going to search me or anybody here." The officer testified: "[D]efendant Seymour Cassel made a movement toward his left rear pocket . . . . He then extracted his hand into [*sic*] her purse [defendant Betty Lou] which she was carrying on her arm. He then turned around and ran to the street side of the vehicle and around to the front of the vehicle.

"Q. Did you see his hand enter her purse?

"A. Yes.

"Q. Did you see anything in his hand when it was extracted from her purse?

"A. No, I did not. . . . Defendant Seymour made a complete circle to the front of his vehicle, then came directly back to where I was standing with the other three suspects— . . . He dropped to the ground directly behind the other defendant—Seymour's wife—a Lucky Strike cigarette package crumpled up." Officer Harwood retrieved the package and handed it to Officer Frost who examined it and discovered therein three hand-rolled cigarettes which appeared to be marijuana, and a small tinfoil-wrapped package which contained a white powder.

It was stipulated that the cigarettes contained marijuana and the tinfoil contained cocaine.

The officer further testified that for the taillight violation it is customary to give a citation or a warning to the driver of the vehicle. He admitted he saw nothing in defendant Seymour's hand but because of the movement he "guessed" he may have had contraband.

■ The sole contention, which is raised on behalf of both defendants, is that the marijuana cigarette (count II) seized was the product of an illegal search and seizure and was therefore inadmissible in evidence. With this contention we agree. The marijuana cigarette should not have been received in evidence, so we reverse.

Th officer's observation of defendant Seymour's "quick, fast movement with his right hand so as to place an object in between he and his wife" together with his testimony that he did not see anything in that defendant's hand was insufficient to give the officers probable cause to search or arrest defendant Seymour. There was neither rhyme nor reason for the arrest of the defendant's wife, Betty Lou, and surely no probable cause to search her or her purse or to arrest her.

There is nothing in the record to indicate that either defendant was attempting to hide anything—they were not narcotics addicts, nor were they suspected of being such—the officer had never seen the defendants, or their car before. The officer did not see anything in the hands of either defendant. In fact, all the officer saw was what he described as a fast movement of defendant Seymour's hand as if to place an object on the seat between himself and his wife. To indulge in speculation as did the officer, Seymour might well have been scratching himself; he might have been reaching for his wallet with his identification and documents therein or he might even

simply have been changing his physical position, none of which activities would seem to be reasonable cause to suspect him of committing a felony; and by no stretch of the imagination did the defendant's wife, Betty Lou, do anything. (See *People* v. *Moray,* 222 Cal.App.2d 743 [35 Cal.Rptr. 432].)

We can find no "furtive gestures" or "furtive movements" in the case at bench which would establish probable cause to search or arrest the defendants who were passengers and occupants of the vehicle.

"The difficulty is that from the viewpoint of the *observer,* an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious." (*People* v. *Superior Court,* 3 Cal.3d 807, 818 [91 Cal.Rptr. 729, 478 P.2d 449].)

It is because of this danger that the law requires more than a mere "furtive gesture" to constitute probable cause to search or to arrest. In the instant case the officer saw nothing more than a "fast movement of defendant Seymour's hand as if to place an object between himself and his wife [the other defendant] on the back seat." And, we must add, no movement at all on the part of the wife, Betty Lou.

"Just as the arresting officer in an ordinary traffic violation case cannot reasonably expect to find contraband . . . [on the person of a passenger], so also he cannot expect to find weapons [on the person of the passenger]. To allow the police to routinely search for weapons in all such instances would likewise constitute an 'intolerable and unreasonable' intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile. It follows that a warrantless search for weapons, like a search for contraband, must be predicated in traffic violation cases on specific facts or circumstances giving the officer reasonable grounds to believe that such weapons are present in the vehicle [or on the person of the passengers] he has stopped." (*People* v. *Superior Court, supra,* 3 Cal.3d 807, 829.) The

principles recited in the above case were reaffirmed in *Gallik* v. *Superior Court,* 5 Cal.3d 855 [97 Cal.Rptr. 693, 489 P.2d 573].

The purported appeals from the motions and orders are dismissed.

The judgments (orders granting probation) are reversed.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied March 9, 1972, and respondent's petition for a hearing by the Supreme Court was denied April 19, 1972.