[Crim. No. 22254. Second Dist., Div. Five. Sept. 5, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JAY FREDERICK EVANS et al., Defendants and Appellants.

---

**COUNSEL**

Luke McKissack for Defendants and Appellants.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow and Ellen Birnbaum Kehr, Deputy Attorneys General, for Plaintiff and Respondent.

---

## OPINION

**KAUS, P. J.**—Defendants appeal from a conviction of possession of marijuana for sale. (Health & Saf. Code, § 11530.5.)

## FACTS

Shortly before midnight on May 24, 1971, Sheriff Deputies Varro and Smith saw a van traveling at about 55 to 60 miles an hour in a zone with a posted speed limit of 35 miles per hour. They stopped the van. It appeared that Garvas was the driver and Evans the only passenger. Deputy Smith approached Garvas, while Varro went to the passenger side. As he approached Evans, he saw him faced "toward the rear . . . and moving about." Evans' back was turned toward him. Varro tapped on the rolled-up window on the passenger side. Evans rolled it down. Varro asked him for identification. At that time he noticed an "extremely strong smell of alcoholic beverage." It smelled like wine. There was no alcohol on his breath. Varro believed the smell of alcohol was too strong to be coming from one or two persons.[1] He asked Evans to step out of the vehicle. He suspected that there was an open container of an alcoholic beverage in the van. (Veh. Code, § 23123.) Apparently at about the same time as Varro asked Evans to step out of the vehicle, he also requested him to pull back a curtain which separated the area of the two front seats from the back of the van. Evans complied. Using a flashlight Varro determined that no other person was in the back. From where he was standing, Varro could not see whether there was an open container in the front part of the vehicle. Both Evans and Garvas then stepped out of the van and were taken to the rear where they remained with Deputy Smith for the time being. Varro then reentered the van to look for the open container which he suspected to be inside. He noticed a large brown paper sack on the console between the seats. Thinking that it might contain a bottle he opened it. Instead of a bottle, he saw a large quantity of money which appeared to consist of many twenty dollar bills.[2] At that point his thoughts shifted from open containers to armed robbery and counterfeiting. He took the bag to Deputy Smith and informed him of his suspicions. Garvas and Evans were asked how much money was in the bag. Both said that they had no idea.

Varro reentered the van. As he climbed across the console to the back he noticed several canvas bags scattered about on the floor. He slipped on one of them and fell against another which was partially open. With his

---

[1] At another point Smith described the odor as "overpowering."

[2] It was eventually determined that the exact amount of cash in the bag was $21,125.

flashlight he "peered into the opening, into the bag, and observed numerous square packages resembling kilos of marijuana."[3] The marijuana was soaked in wine. Eventually it developed that the several canvas bags in the back of the van contained "50 compressed bricks of plant material, 35,026 grams total weight marijuana."

## CONTENTIONS

On appeal defendants contend: 1. the marijuana was illegally seized; and 2. the People failed to establish that Evans was in knowing possession of contraband.

1. ■ *The Seizure:* Defendants attack every single step which led to the discovery of the contraband. None of their contentions has merit.

They first impugn the stopping of the van, pointing to the fact that it was not being driven erratically and that there was no other traffic on the road.

The speed of the van exceeded the posted limit by 20 to 25 miles per hour. (Veh. Code, § 22362.) While there was no moving traffic at the time, there were vehicles parked along the side of the street and there were two bars in the area. Certainly the officers had "reasonable cause to believe" that a public offense had been committed in their presence. (Pen. Code, § 836.)

Defendants claim that Varro had no right to order Evans to leave the vehicle. In the circumstances, Varro was entitled to ask Evans to roll down the window to talk to him. (*People* v. *Superior Court (Kiefer)* 3 Cal.3d 807, 830 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].) At this point, when Varro smelled an overpowering odor of alcohol that could not have been coming from one or two people, he was entitled to investigate further. It was not unreasonable to order Evans out of the car. (*People* v. *Figueroa,* 268 Cal.App.2d 721, 726-727 [74 Cal.Rptr. 74].) We cannot say that the request violated any substantial right of Evans.

■ The discovery of the large amount of cash in the brown paper bag is attacked on the ground that it was not necessary for Varro to open the

---

[3] While the record is by no means 100 percent clear on the point, it clearly supports the inference that the bag in question was open when Varro first saw it. His first description of the bag was precisely to that effect. Matters became confused when, in answer to the question "did you have to open the bag to observe the kilos," he answered, "I opened one end of the bag." A little later, when he was asked whether any "part of the contents of the bag itself was exposed," he answered, "no." Later still, during cross-examination, he testified that he slipped and landed "on a partially filled bag in [*sic*] which time he looked in the bag and the end was opened." He also testified: "The bag on the floor was already opened from which I viewed the one brick and upon opening it far enough I shined my flashlight in and seen the rest of them. . . ."

bag in order to ascertain whether it contained an open beverage container. In making this argument defendants equate brown paper bags with people, claiming, in effect, that in searching for a container Varro was bound to use the least intrusive means of accomplishing his purpose. Thus, they argue he could have determined that the bag contained neither a bottle nor can by squeezing it. (Cf. *Terry* v. *Ohio,* 392 U.S. 1, 25-26 [20 L.Ed.2d 889, 908-909, 88 S.Ct. 1868]; *People* v. *Mickelson,* 59 Cal.2d 448, 452-454 [30 Cal.Rptr. 18, 380 P.2d 658].)

We know of no rule of law to the effect that although the police are entitled to search, they must disprove, with respect to every stage of the search, that their objective could have been attained by less intrusive methods. There is no suggestion in this case that Varro peeked rather than pinched because he was not really looking for a bottle or a can. He simply employed one reasonable means of ascertaining what was inside the bag instead of another. That he was entitled to look for a container, admits of no doubt. Whether or not a suspicion that such a container was in the rear of the van—which had no trunk—would have pointed to a violation of section 23123 of the Vehicle Code is not terribly important. The brown paper bag was within easy reach of the driver.

■ Once the unusual amount of cash, genuine or contraband,[4] was found, the focus of the search shifted. The officers reasonably suspected that the money was the fruit of a robbery or counterfeit and searched for further contraband or evidence. In view of the mobility of the vehicle they were entitled to do so. (*Brinegar* v. *United States,* 338 U.S. 160, 164 [93 L.Ed. 1879, 1884, 69 S.Ct. 1302]; *Carroll* v. *United States,* 267 U.S. 132, 153-154 [69 L.Ed. 543, 551-552, 455 S.Ct. 280, 39 A.L.R. 790].) The right to search did not depend on the right to arrest. (*Carroll* v. *United States, supra,* 267 U.S. at p. 156 [69 L.Ed. at pp. 552-553].) In the course of the clearly permissible search, Varro then literally stumbled onto contraband. (Cf. *People* v. *Superior Court (Kiefer) supra,* 3 Cal.3d 807, 816-817.)

■ Defendants raise an additional issue which is surely *sui generis:* that "the prosecution gave away the evidence which the Court relied upon to justify the search of the rear portion of the van where the contraband was found." They refer to the money, genuine or counterfeit, which was found in the paper bag.

We leave aside the question whether the discovery of the money was essential to justify searching that portion of the van within reach of the driver. We also assume, but do not decide, that a perversely technical

---

[4]Deputy Varro, the only witness, professed an inability to determine the genuineness of the cash. This, of course, in no way destroyed the obvious inferences which the deputy could draw from the large amount and defendants' improbable denials.

application of the best evidence rule (Evid. Code, § § 250, 1500) would—on proper and timely objection—preclude the receipt of secondary evidence concerning "the contents" of the pieces of paper found in the bag. We find simply that the way the problem arose below precludes its consideration here.

At defendants' preliminary hearing Varro's evidence concerning his discovery of the money, his questioning of defendants with respect thereto and his suspicions as to its significance was received without objection. After a motion to dismiss had been extensively argued and denied, counsel for Garvas requested that the money "be sequestered by the District Attorney and the bills kept available." The prosecutor announced that the money had been turned over to the "Federal Government." The magistrate suggested that defense counsel should take steps to obtain the evidence. Counsel, however, had a better idea: he moved—belatedly and, of course, unsuccessfully — to strike all testimony "with reference to the $21,000 themselves on the ground that the dollar bills would be the best evidence." The court then repeated its ruling denying the motion to dismiss.

In the superior court motions under sections 995 and 1538.5 of the Penal Code were argued and submitted, one right after the other, on the transcript of the preliminary hearing. During the argument on the 995 motion counsel did deplore the People's failure to preserve the money and permit the United States—apparently it was the Internal Revenue Service —to "confiscate" the evidence. He did not, however, argue the matter from the point of view that secondary evidence had been erroneously received. The 995 motion was denied. There was no further argument on the point in connection with the 1538.5 motion. The matter was then submitted for decision on the same, by now presumably well-thumbed, transcript. No further demand on the People to produce the money was made.

Any objection based on the best evidence rule was waived by failure to assert it at the proper time. The point that the People suppressed evidence relevant to a proper consideration of the motion to suppress simply was not pursued. The 1538.5 motion did not have to be submitted on the transcript of the preliminary hearing. If counsel had been sincere in his[5] desire to see the money in court, he should have moved to that effect

---

[5]While we speak of counsel in the singular, the fact is that defendants had separate representation at all stages below. From time to time, however, it seemed to be accepted that objections, motions and statements by one counsel were made on behalf of both.

and the obviously tricky problem of how to pry it out of the Internal Revenue Service could have been explored.

The seizure was legal.

2. ■ *Sufficiency of the Evidence.* As noted, the issue of sufficiency of the evidence to convict is only raised on behalf of Evans, the passenger. It is, indeed, a rather close question. Obviously the case which must be distinguished, if we are to affirm, is *People* v. *Williams,* 5 Cal.3d 211 [95 Cal.Rptr. 530, 485 P.2d 1146]. There a benzedrine tablet had been found near the foot of the front seat passenger of a parked car. About 1,000 more tablets were later found under the driver's seat. The driver was absent. Reversing the passenger's conviction, the court held that while there was sufficient circumstantial evidence that the defendant had constructive possession of the single tablet, nothing in the record justified an inference that he knew that it was a restricted dangerous drug. The court considered as too ambiguous evidence that when first observed, the defendant had made "a motion to the center of the seat." It referred to *People* v. *Superior Court (Kiefer) supra,* 3 Cal.3d 807, 818-819, where it had discussed the significance of "furtive gestures" as they relate to probable cause to search and arrest. (5 Cal.3d at p. 216.)

We cannot read *Williams* to mean that the significance of furtive gestures in the probable cause context necessarily remains zero when the issue changes from probable cause to guilt. Then the meaning of a defendant's movements can be evaluated in the light of all other facts which a later, legal search has brought to light. Even *Kiefer* recognizes that a "furtive gesture coupled with prior reliable information may constitute probable cause." (*Id.,* at p. 819.) If reliable information can turn innocuous movements into indicia of guilt, surely there must be cases where the demonstrated presence of contraband can do the job.

In *Williams* the facts were such that even the later physical discovery of the contraband imparted no guilty significance to the defendant's vaguely described "motion to the center of the seat." It had no reasonable relationship to the contraband. Here the facts are quite different: at least one of the bags containing marijuana —the one over which Varro stumbled—was found immediately behind the two front seats, which were separated from the interior of the van by an easily lifted curtain. Clearly the trial court was free to infer that Evans' conduct when Varro approached the car was prompted by understandable concern that the rather bulky contraband to

the rear of the two occupants would arouse police curiosity.[6] The evidence was sufficient.

Affirmed.

Stephens, J., and Ashby, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 31, 1973.

---

[6]In discussing the issue of the sufficiency of the evidence we have deliberately refrained from mentioning the possible significance of the other, quite unusual, features of this case: the large amount of money and the odor which met the officers. While these two factors—particularly, of course, the money—point to criminal conduct of some kind, we find it both difficult and unnecessary to assess their significance on the issue of knowledge of the narcotic nature of the marijuana.