Filed 12/10/25  Eason v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| ALAEANTE AKILA EASON, | |
| Petitioner, | E085972 |
| v. | (Super.Ct.No. FSB23003716) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Ronald M. Christianson, Judge.  (Retired Judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Petition denied.

Thomas W. Sone,  Public Defender, Justin Ewaniszyk, and Timonthy R. Douglass, Deputy Public Defenders for Petitioner.

No appearance for Respondent.

1

Jason Anderson, District Attorney and Heather Dwyer, Deputy District Attorney for Real Party in Interest.

Petitioner Alaeante Akila Eason seeks writ relief from the denial of his motion to suppress evidence discovered during a warrantless search of his car during a traffic stop. He argues the search was conducted without probable cause, that his detention during the stop constituted an arrest without probable cause, and that the stop was unconstitutionally prolonged. We reject each of these arguments and deny the petition.

FACTS

At Eason's preliminary hearing, San Bernardino police officer Robert Hines testified that at about 5 p.m. on May 27, 2023, he and his partner were on patrol in an area "known for" prostitution and human trafficking, weapons, and narcotics. Hines saw a car with dark, tinted windows roll through a stop sign. The car did not immediately stop when the officers first turned on their patrol vehicle's lights, but continued for "a few moments." During those few moments, it slowed down, made a turn at the next intersection, and drove slowly about half a block before stopping. As the car continued, it made "several quick, jerky movements," which Hines interpreted "as being something similar to somebody holding on to the steering wheel while trying to maintain control of the vehicle while also reaching back into the car." While initiating the stop, Hines determined the car was registered to an Oceanside address. Hines testified that, in his training and experience, this was significant because "pimps do travel with their

2

prostitutes or victims" to San Bernardino from other parts of California and from other states.

Although the rear window of the car was tinted, Hines said it was still possible to see "outlines of people's bodies and to see how those bodies were positioned." As he approached the passenger side of the car (and as his partner approached the driver side) he saw the driver reach back into the rear passenger's side of the car with his right arm for "maybe a second or two." Hines interpreted that motion as the driver "trying to hide or separate themselves from something illegal and place it into a different portion of the car." On cross-examination, Hines agreed that the driver's motions were not visible on his body camera video, but said the quality of the video "is quite poor" in comparison to "real life" observations and that the body camera's angle on the scene was different from his eye level.

When the officers reached the car, they found two occupants; Eason driving, and a female in her early 20s in the front passenger's seat. Eason seemed "really nervous, because he was speaking very quickly, and he was also looking for documents that [the officers] had not asked for at that time." Hines and his partner both asked Eason to roll the windows of the car down, but he initially failed to roll down the rear windows, and then only rolled down the driver side rear window; he did not roll down the rear passenger side window. The passenger did not respond to Hines's questions, including when he asked her name.

3

Hines's partner had the driver exit the car, handcuffed him, and had him sit on the curb. Meanwhile, Hines noticed by looking through the open front passenger window that it looked like the bench portion of the rear seat "was slightly lifted up just barely" on the passenger's side, "slightly higher than . . . on the rear driver's side." Hines then had the passenger exit the vehicle, placed her in handcuffs, and seated her in his patrol unit. As Eason sat on the curb, he continued to act in an agitated manner, protesting (with profane interjections) that it was just a "traffic stop," encouraging the officers to "run" his name, give him a ticket, and let him go. In Hines's experience, drivers who are "extremely persistent" in trying to "rush the encounter" are "usually conducting criminal activities."

Hines searched the passenger compartment of the car. He did not find anything in a bag that was on the rear seat. Under the bench of the rear seat on the passenger side, where the seat had been slightly ajar, he found a loaded "Glock-17 firearm with an extended magazine."

In January 2024, the People charged Eason with being a felon in possession of a firearm (Pen. Code[1], § 29800, subd. (a)(1), count 1) and carrying an unregistered loaded firearm in a vehicle on a public street (§ 25850, subds. (a), (c)(6), count 2), as well as recidivism-based enhancements.

At his preliminary hearing, Eason moved to suppress evidence, arguing among other things that Hines had no probable cause to search the car. The magistrate denied

---

[1] Undesignated statutory references are to the Penal Code.

the motion. The magistrate explained its view, based on the totality of the circumstances—specifically, Eason "not immediately yielding to the red lights," and also Hines's "observations of the movement inside the vehicle and then observations of the rear seat"—that there was probable cause to believe "there was either a weapon or contraband under the rear seat and; therefore, probable cause to search that area of the vehicle." It noted Hines's testimony about human trafficking in the area of the stop, but because there was "no evidence that there was an investigation of human trafficking," that testimony did not "play a role in the Court's findings."

Defendant's counsel argued that none of the movements that the officer testified to could be seen through the windows of the car in the video from the body camera. The court, however, indicated that it had looked at the video and it could "make out" the front seat and post of the vehicle through the tint, and the officer's eye "may well see better than a camera significantly lower." So the court credited the officer's testimony that he saw a silhouette of the driver reaching back to the back seat.

Eason renewed his suppression motion (§§ 995, 1538.5, subd. (i)), but the court denied the renewed motion.

Eason petitioned this court for writ relief and requested a stay. We granted Eason's stay request and, after inviting and receiving an informal response from the People, we issued an order to show cause.

5

DISCUSSION

A. *Search of Eason's Car*

Eason argues Hines lacked probable cause to search his car, so the fruits of that search should be suppressed.  We disagree.

"A criminal defendant may test the unreasonableness of a search or seizure by making a motion to suppress at the preliminary hearing . . . ."  (*People v. Superior Court (Cooper)* (2003) 114 Cal.App.4th 713, 717.)  "If the magistrate denies the motion, the defendant may either renew the motion before the trial court or file a motion to dismiss under Penal Code section 995 raising the suppression issue."  (*People v. Turner* (2017) 13 Cal.App.5th 397, 404.)  Both motions are reviewable by writ.  (§§ 999a & 1538.5, subd. (i).)

Where, as here, section 995 and section 1538.5 motions are both denied, we review the magistrate's findings of fact for substantial evidence.  (*People v. Shafrir* (2010) 183 Cal.App.4th 1238, 1244-1245 (*Shafrir*).)  We do not consider conflicts in the evidence or weigh the strength of the evidence.  (*People v. Navarro* (2021) 12 Cal.5th 285, 302; see *People v. Ennis* (2010) 190 Cal.App.4th 721, 729 (*Ennis*), quoting *People v. Huston* (1943) 21 Cal.2d 690, 693 ["Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the [finder of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)  The testimony of a single witness may constitute substantial evidence so long as it is not physically impossible or

6

inherently improbable.  (E.g., *People v. Elliott* (2012) 53 Cal.4th 535, 585.)  Thus, in examining the magistrate's factual findings, our "only question is: Does it seem *possible* that what the witness claimed to have happened actually happened?"  (*Ennis*, at p. 729.)

Then, "[i]n determining whether, on the facts so found, the seizure was reasonable under the Fourth Amendment, we exercise our independent judgment."  (*In re Jeremiah S.* (2019) 41 Cal.App.5th 299, 306.)

"When the police have probable cause to believe an automobile contains contraband or evidence they may search the automobile and the containers within it without a warrant."  (*People v. Superior Court (Nasmeh)* (2007) 151 Cal.App.4th 85, 100.)  "'[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'"  (*People v. Moore* (2021) 64 Cal.App.5th 291, 297 (*Moore*), quoting *Illinois v. Gates* (1983) 462 U.S. 213, 232.)  "Probable cause is a more demanding standard than mere reasonable suspicion."  (*People v. Johnson* (2020) 50 Cal.App.5th 620, 625 (*Johnson*); see *People v. Flores* (2024) 15 Cal.5th 1032, 1041 [reasonable suspicion requires "'"considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause"'"])  Probable cause exists "'where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found.'"  (*Moore*, at p. 297.)  "[W]e consider the totality of the circumstances, and analyze these

facts as would a reasonable police officer, in assessing the officer's probable cause, rather than looking to singular facts in a vacuum." (*Id*. at p. 298.)

The People argue our examination of the record should be limited to the preliminary hearing transcript, and we "should not view" Hines's body camera video or a transcript of that video that were lodged as exhibits. The argument is unsupported by citation to authority, and it is meritless. We are bound by the magistrate's factual findings only to the extent those findings are supported by substantial evidence. (*Shafrir, supra*, 183 Cal.App.4th at pp. 1244-1245.) How the People imagine we might determine whether the magistrate's factual findings are supported by substantial evidence without viewing all the evidence is a mystery we will not attempt to solve.

Eason makes the opposite argument, asking us to disregard Hines's preliminary hearing testimony about seeing Eason reach into the rear seat of the car, which he views as negated by the video evidence from Hines's body camera. Eason's idea is that because Eason's movements, as described by Hines, are not visible in Hines's body camera video, and neither officer is heard in the video alerting the other that Eason seemed to be reaching into the rear seat, Hines's testimony must be "merely a post-hoc rationalization for a non-probable cause search."

This reasoning only shows, however, that Hines's testimony was "'subject to justifiable suspicion.'" (*Ennis*, *supra*, 190 Cal.App.4th at p. 729.) That is not enough for us to disturb the magistrate's credibility determinations or factual findings. As a reviewing court on this record, we have no basis to conclude it is impossible that Hines

8

could see what the driver was doing, even though his body camera could not, because of some combination of the capabilities of the camera and the slightly different angle of eyes and lens. The magistrate, present for the officer's testimony, relied on this point to determine that it was possible that Hines could see what the body camera does not depict. There are also plausible reasons why Hines did not verbally warn his partner of what he saw as they approached the car. Perhaps the officers communicated non-verbally. Perhaps they had already, before the camera turned on, discussed that it seemed the driver was reaching around the car based on how he was driving, so no additional discussion was necessary. Perhaps Hines simply failed to follow what Eason assumes, without a basis in evidence, to be standard police operating procedure. Because we do not find Hines's testimony physically impossible or inherently improbable, we must defer to the magistrate's decision to credit that testimony.

Based on Hines's testimony, as well as the footage from his body camera, the factors potentially tending to support a probable cause finding are (1) Eason was pulled over in a high crime area; (2) Eason did not immediately pull over when the officers initiated the traffic stop, but continued for "a few moments"; (3) the "several quick, jerky movements" Eason's car made before he pulled over; (4) Eason's furtive movements as the officers approached the car, reaching toward the rear passenger side of the car; (5) Eason's nervous demeanor once the officers contacted him; (6) Eason's failure to follow instructions to roll all the windows down, instead leaving the rear passenger window up;

9

and (7) the rear passenger bench seat was visibly out of place, with the rear passenger side slightly elevated.[2]

"California courts have traditionally been skeptical of the high-crime factor in determining probable cause." (*Moore*, *supra*, 64 Cal.App.5th at p. 301.) Nevertheless, "while certainly not enough on its own, '[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely.'" (*Ibid.*) Here, however, the trial court discounted Hines's testimony that Eason was pulled over in a high crime area, and decided it would not "play a role" in its analysis. We agree that Hines's testimony that the area was "known for" prostitution and human trafficking, as well as weapons and narcotics crimes, weighs minimally, if at all, in support of a finding of probable cause.

The "quick, jerky movements" by Eason's car before he pulled over, which Hines interpreted to indicate the driver was reaching around the car, are properly analyzed under case law regarding furtive movements, as is Hines's direct observation of Eason

---

[2] The People propose Eason's passenger, "a woman in her twenties [who] would not disclose her identity," as another factor in favor of a finding of probable cause. The People do not, however, articulate any reason her presence would tend to weigh in favor of a finding of probable cause for the search, and we see none. Although the officers' statements during the stop may show they suspected the passenger might be involved in prostitution, no evidence supporting a reasonable belief she was concealing contraband was introduced at Eason's preliminary hearing.

We also do not find it significant that Eason's car had a "non-local registration." We do not doubt that, as Hines testified, "pimps do travel with their prostitutes or victims" to San Bernardino from other parts of California and from other states. But so do many law-abiding citizens—far too many for non-local vehicle registration to have any meaningful weight in the probable cause analysis.

reaching into the back seat of the car.  Mere furtive movements by the occupant of a

vehicle being pulled over for a traffic violation are insufficient to establish probable

cause.  (E.g., *People v. Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 823 (*Kiefer*) [mere

furtive movement of occupant in vehicle being chased by officer for traffic violation

insufficient to establish probable cause].)  Rather, "to constitute probable cause for . . . [a]

search, a 'furtive gesture' such as a motorist's act of bending over inside his car must be

invested with guilty significance either by specific information known to the officer or by

additional suspicious circumstances observed by him."  (*Gallik v. Superior Court* (1971)

5 Cal.3d 855, 859.)  Here, Hines had no specific information independent of his

observations, and his observations of Eason's movements were not coupled with any

"actual observation of contraband" or an item like a box or package reasonably inferred

to be contraband.  (*Kiefer*, *supra*, 3 Cal.3d at p. 819.)

It is potentially significant that Hines saw Eason reach into the rear seat of the car.

"[T]he act of simply bending forward or downward in the front seat of an automobile has

. . . many more innocent than culpable interpretations."  (*Kiefer*, *supra*, 3 Cal.3d at p.

819, fn. 5.)  It is more plausible to infer that someone is hiding contraband when they

make more unusual movements, particularly in connection with other factors.  For

example, when a police officer saw a taxi passenger who had just been instructed to exit

the vehicle pull his hand out from behind his seat "at the juncture of the seat and back

cushion," the officer "had reasonable grounds to believe that he was hiding contraband."

(*Ibid.* [discussing *People v. Blodgett* (1956) 46 Cal.2d 114, 117].)  Hines's view of

Eason's motion was limited only to outlines, and he did not specifically see where Eason was reaching. This observation alone, therefore, cannot by itself establish probable cause; what Hines saw was wholly consistent with Eason, say, reaching back to retrieve his driver's license from the bag on the seat. But it nevertheless may have significance in combination with other factors.

A driver's failure to stop promptly when signaled to do so by a police officer may weigh in favor of a finding of probable cause to search the car, depending on the circumstances. Where the driver "continues to drive for a substantial distance and makes sharp turns or other unusual maneuvers . . . such conduct can fairly be deemed evasive action, implying consciousness of guilt." (*Kiefer*, *supra*, 3 Cal.3d at p. 825.) On the other hand, "[i]t is a motorist's duty to use due care at all times, and when requested to pull over by a police officer he should do so at the first *safe* opportunity." (*Ibid.*) Hines's testimony suggests, without quite establishing, that Eason did not pull over at the first safe opportunity.[3] He did, however, slow down, he made no sharp turns or other unusual maneuvers that could fairly be deemed evasive action, and he only continued driving for "a few moments" before pulling over. In our view, Eason's failure to pull over immediately weighs in favor of a finding of probable cause, but is not alone sufficient to imply consciousness of guilt.

_____

[3] Hines was not asked specifically whether Eason could have safely pulled over before he did, nor can we make any determination about that from his body camera video.

12

Eason's "[n]ervous, evasive behavior" during the stop is "undoubtedly a potentially significant factor to be considered in determining whether probable cause . . . exists." (*Moore*, *supra*, 64 Cal.App.5th at p. 302.) In this category, we include Eason's rapid speech and fumbling with paperwork he had not yet been asked to provide. We also include his failure to follow instructions to roll down all the windows of the car, which could be an accidental omission that he did not have time to correct before he was asked to step out of the car or an intentional evasion intended to inhibit the officers' view of the rear passenger seat. We also include his attempts to rush the traffic stop, repeatedly insisting Hines run his name, write him a ticket, and let him go. To be sure, "[n]ervousness by itself . . . does not establish probable cause." (*Ibid.*) "[E]ven in conjunction with 'furtive movements,'" a driver's nervousness does not "distinguish those who are guilty from 'any other harried citizen.'" (*Kiefer*, *supra*, 3 Cal.3d at p. 826, fn. 12.) Nevertheless, Eason's demeanor and behavior was a significant factor favoring a finding of probable cause.

The bench part of the rear seat of the car being slightly elevated and out of place is not, on its own, a basis for probable cause. In our view, the space under the seat is analogous for purposes of this analysis to a trunk or other enclosed compartment in a vehicle. A difference is that it is not routinely used as a storage compartment, but nevertheless any search of that space is predicated on the premise that it is being used as such. "[C]ourts generally find warrantless searches of trunks and other enclosed compartments in a vehicle justified in three categories of circumstances: (1) officers have

13

probable cause to believe contraband or evidence of a crime will be found specifically in the trunk or other enclosed compartment; (2) a search of the passenger compartment reveals contraband or other evidence generating further probable cause to search the trunk or other enclosed compartment; or (3) probable cause exists as to the entire car (i.e., that the contraband or evidence of a crime will be found somewhere in the car)." (*People v. Leal* (2023) 93 Cal.App.5th 1143, 1151-1152 (*Leal*).) Only the first of these categories is potentially relevant here.

"Facts that create probable cause to believe contraband or evidence of a crime will be found specifically in the trunk or enclosed compartment often involve situations where officers see the defendant access the area and either place evidence in the area or remove evidence from the area." (*Leal*, *supra*, 93 Cal.App.5th at p. 1152.) Here, Hines did not specifically see Eason reach under the rear seat of his car and place something there; he saw only the outline of a reach toward that general area of the passenger compartment. In our view, it was reasonable for Hines to put two and two together and *suspect* that Eason had concealed something under the rear seat, causing the seat to be slightly elevated on that side. But that is not the same thing as probable cause. (See *Johnson*, *supra*, 50 Cal.App.5th at p. 625.)

Although we find it a close question, we conclude the totality of the "'historical facts'" (*Moore*, *supra*, 64 Cal.App.5th at p. 298) known to Hines before the search, together with reasonable inferences from those facts, amount to probable cause for the search. No one factor alone established probable cause. Nevertheless, the combination

14

of factors—Eason's failure to immediately pull over; his furtive movements within the car, both inferred from the way he was driving and his reach to the rear passenger-side area as the officers approached the car after he pulled over; the rear seat bench being slightly elevated in the area where Eason had reached; and Eason's nervous and evasive behavior—in our view were sufficient for a reasonable police officer to believe contraband or evidence of a crime was concealed underneath the rear seat of the car. As such, Hines had probable cause for the warrantless search that revealed a firearm hidden there.

B. *Detention or arrest*

Eason does not dispute that it was lawful for Hines and his partner to pull him over on a traffic stop, and then to order him out of his car during that stop. (See *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111, fn. 6 [during a proper traffic stop, "police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"].) He argues, however, that handcuffing him was not reasonably necessary and transformed his detention into an arrest without probable cause. We are not persuaded.

"Handcuffing substantially increases the intrusiveness of a detention and is not part of a typical detention." (*People v. Stier* (2008) 168 Cal.App.4th 21, 27 (*Stier*).) "Nevertheless, because a police officer may take reasonable precautions to ensure safe completion of the officer's investigation, handcuffing a suspect during a detention does not necessarily transform the detention into a de facto arrest." (*Ibid.*) "The issue is

15

whether the handcuffing was reasonably necessary for the detention." (*Ibid.*)

"Generally, handcuffing a suspect during a detention has only been sanctioned in cases where the police officer has a reasonable basis for believing the suspect poses a present physical threat or might flee." (*Ibid.*)

Hines and his partner had ample basis for believing Eason might pose a present physical threat or might flee. Eason failed to pull over immediately, and in the short time before he did, he drove in a manner that led Hines to suspect he was reaching around the passenger compartment of the car, either to retrieve something or to hide something. Either way, that is some reason to be concerned Eason might have a weapon in the car that he was trying to either hide from officers or retrieve to use against the officers. When the officers contacted Eason, he appeared nervous and agitated. (Cf. *Stier*, *supra*, 168 Cal.App.4th at p. 28 [officer testified suspect was "'very cooperative,' 'very easygoing,' 'very docile,' 'very polite,' and 'very mellow'"].) The two officers were not outnumbered by the two people in Eason's car, but Eason was "much larger in size and stature" than both Hines and his partner.

Given these circumstances, we find nothing unreasonable in the officers' decision to handcuff Eason during the detention, and doing so did not transform the detention into an arrest.

## C. *Prolonged detention*

Eason argues his detention was unreasonably prolonged. The argument does not merit extended discussion. Within minutes after Eason pulled over, Hines had noticed

16

the rear seat of the vehicle was slightly elevated and out of place, the last piece of the puzzle that made up probable cause to search the car, and the entire traffic stop lasted less than 15 minutes. (See *People v. Russell* (2000) 81 Cal.App.4th 96, 101-103 [no unreasonably prolonged detention; arrest was 25 minutes after officer's first verbal contact with defendants and had reasonable grounds to investigate].) The officers' search of the car commenced about 10 minutes after Eason and his passenger were removed from the car, and Hines discovered the firearm less than three minutes later. There is nothing unduly prolonged about this timeline.

DISPOSITION

Eason's petition for writ of mandate is denied, and our order staying further proceedings is vacated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL

J.

We concur:

CODRINGTON

Acting P. J.

MENETREZ

J.

17